Filed 7/14/16  Certified for Publication 8/11/16 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| JONATHAN C. ELLIS, | B264040 |
| Respondent, | (Los Angeles County Super. Ct. No. KF004785) |
| v. | |
| CRYSTAL L. LYONS, | |
| Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Rocky L. Crabb, Commissioner.  Affirmed in part, reversed in part, and remanded.

Crystal L. Lyons, in pro. per., for Appellant.

Kari Hong for amicus curiae on behalf of Appellant.

Estelle & Kennedy, Michael Kennedy, for Respondent.

Appellant Crystal Lyons (Mother) appeals the denial of her request for sole legal and physical custody of her minor daughter (Minor) and to reinstate child support from respondent Jonathan Ellis (Father). Father engaged in a physical altercation with his brother-in-law in a room where Minor was present. When informed of the altercation, Mother sought and obtained a temporary protective order in Massachusetts, her state of residence, that barred Father from contacting Minor. The Massachusetts court continued that order in force until the Los Angeles Superior Court—where the family law proceedings had originated—heard Mother's request to change the existing joint custody order. We consider whether the family law court abused its discretion when it denied Mother's request for sole custody of Minor, and in answering that question, we address what effect California law required the family law court to give to the Massachusetts court's findings.

## I. BACKGROUND

Minor was born to Mother and Father in February 2001. Mother and Father's relationship ended that same year, and in 2002, Father filed a paternity action. Pursuant to a November 2009 stipulated judgment, the parents share joint legal and physical custody of Minor, and she lives most of the year in Massachusetts with Mother, who has since remarried. Father lives in Southern California at his parents' home, and he has custody of Minor for five weeks every summer, on spring breaks, and on alternating winter breaks.

### A. *Father Gets in a Physical Altercation in Minor's Presence*

In April 2014, Minor was in Southern California for her weeklong spring break visit with Father. Generally, Father and Minor would go shopping, play games, play softball and tennis, and go to the bookstore during her visits. While at Father's house, Minor would sleep on the sofa in his bedroom and Father would sleep downstairs.

On April 21, 2014, the day after her arrival, Minor witnessed an argument between Father and his adult brother-in-law Andy. Andy began to touch the cables behind Father's TV console, and Father asked him not to do so. Andy responded, "I can do what I want. What are you going to do about it?" Andy's 12-year-old son Stevie then began to mishandle Father's video game controller, and Father became upset and repeatedly told him to stop. Father told Stevie to go into the other room until he "learn[ed] to listen to instructions." Andy became angry and told Father not to correct Stevie, adding that Father was acting like an "asshole."

What transpired next was the subject of some disagreement between the parties, but the core facts are undisputed. Father and Andy engaged in a physical confrontation while Minor was still seated on a couch roughly three feet away. Father pushed Andy and Father used his fist to strike Andy in his face two or three times. During the altercation, which lasted only seconds, Andy's wife (Father's sister) jumped on Father's back in an attempt to separate both men. They did separate, and neither sustained significant injuries. Minor was not hit in any way during the altercation.

When the altercation between Father and Andy ended, Father noticed Minor had left the room. Father saw an upstairs bathroom door was closed, and he found Minor inside on the phone. Believing Minor had called Mother, Father asked for the phone and instead heard a 911 operator on the other end asking for their address. Father told the 911 operator there was no need to send help because it was just a family squabble and no one had been hurt; as a result, the police did not respond to the home. After hanging up with the 911 operator, Father returned Minor's cell phone to her; she contended he did so only on condition that she promise not to call 911 again, but he said he willingly returned the phone without conditions.

In the aftermath of the incident, Father and Minor discussed it, and Minor's grandmother (Father's mother) joined the conversation at some point. All parties agree that at some point during that discussion, Father threatened to slap Minor. The parties

3

disagree, however, about the timing of when the comment was made and what prompted it.

According to Father, Minor began yelling, telling him that he was overweight, suffering from OCD (obsessive-compulsive disorder), unemployed, antisocial, and not her "real father," which caused him to lose his temper and tell her to stop speaking disrespectfully or he would slap her. Minor admitted telling Father he was overweight, suffering from OCD, and words to the effect that he was antisocial, but she said that was not what prompted his statement that he would slap her. Rather, according to Minor, Father said "[w]ell, do you want me to slap you" earlier in the conversation when she told him that he should not have hit Andy. It is undisputed that Father apologized to Minor for the threat to slap her shortly after he said it. And Father did not hit Minor that day, nor was there any evidence before the family law court that he had hit her at any other time.

The next two days were largely uneventful—Father and Minor went out to play tennis and softball, and they also watched television together. Mother called Minor the day after the altercation, but Minor did not tell her what had transpired between Father and Andy; according to Mother, Minor did say "something was wrong" and that she would talk to Mother about it later when she could. The next day, Minor called Mother and told her about the confrontation between Father and Andy, explaining she was "really scared." Mother was concerned for Minor's safety and told Minor she would help Minor "get out of there," i.e., the home where Father was living.[1]

---

[1] During the evidentiary hearing held by the family law court, Minor admitted it was not just the altercation between Andy and Father that made her want to leave. Rather, she agreed she also wanted to go back home to Mother because she did not want to be visiting Father to begin with. Father and Minor's grandmother also testified that during her visit, Minor said Mother had hired a lawyer and had started paperwork to shorten the time she had to spend visiting Father because Minor wanted to go to summer camp and spend time with friends. According to Minor's grandmother, Minor said her Mother had told her she could change the visitation schedule once she reached 13 years of age (which she then was).

4

*B.      The Massachusetts Protective Order*

Having learned of the altercation between Father and Andy, Mother contacted her attorney in Los Angeles, who on April 23, 2014, attempted to obtain an ex parte restraining order against Father in Los Angeles Superior Court.  Mother's attorney sought the order not in the Pomona courthouse where the case had been litigated, but instead in another courthouse in downtown Los Angeles.  The commissioner who heard the application for the ex parte order declined to issue an order without notice to Father and without Mother being present.  The commissioner instead suggested Mother could notice the matter to be heard in the Pomona courthouse two days later, on April 25, 2014.  Mother did not proceed as the court commissioner proposed; as she would later claim, she feared for Minor's safety if she gave notice to Father of her intention to seek a restraining order.

Instead, on April 25, 2014, Mother applied for a domestic violence abuse prevention order from the Newton District Court in Massachusetts.  After entering a temporary emergency order, the Massachusetts court held a hearing on May 6, 2014, at which Mother and Minor were present.  Father was not present for the hearing, but an attorney appeared on his behalf.  The Massachusetts judge received in evidence an affidavit submitted by Mother that summarized Minor's account of the April 21 altercation, and the court asked several questions of Minor directly.  Minor told the court: "From the day that the incident happened, I was always fearful of . . . [Father].  [H]e's a very intimidating person and I would be asked to go to Kung [Fu] lessons where we would practice moves.  And even then, I wouldn't be able to . . . budge him or . . . move him.  [¶]  And so based on that, I was also very fearful then.  And also if he would threaten to—he would . . . spank me or slap me, I'd also be fearful of that.  And from the day that the incident happened, that just confirmed my fears to where I was afraid to be inside the same room with him."

5

At the conclusion of Minor's testimony, the Massachusetts court issued a restraining order against Father, expressly finding that Minor was credible and in fear of him. The order entered by the court prevented Father from contacting Minor, coming within 100 yards of her, or visiting her school or place of residence. Mother asked the Massachusetts court to keep that order in force for another six months to give her time to pursue modification of the existing custody order in Los Angeles Superior Court. The Massachusetts court stated it would maintain its order in force for three months, until August 6, 2014, explaining that the "[family law] Court in California can – can look at this and make their own determination if they feel they need to have a hearing on it or if one of you is going to go into [family law] Court before that August 6th date."

The parties (this time including both Father and his attorney) appeared in court in Massachusetts on August 6, the date the temporary order was set to expire. Mother asked the Massachusetts court to extend the order until October 6, 2014, by which time she represented the family law court in this state would hear her request for a change in custody. Although the matter was again heard in the Newton District Court, a different judge presided over the proceedings than the judge who heard the matter three months before.

The Massachusetts judge hearing Mother's request for an extension of the order noted the previously assigned judge had issued the order based on a finding that Minor was in "reasonable fear of imminent serious personal injury." The Massachusetts court had before it a transcript of Minor's statements during the prior hearing and the court asked Minor whether she reaffirmed those statements and maintained she continued to be in fear of Father, which she did. Mother told the court that she had seen Minor wake up from nightmares, and that in Mother's opinion, Minor's "fear is real and substantiated." Father, through counsel, argued Mother was engaging in improper forum shopping by pursuing an order in Massachusetts rather than the California court that had jurisdiction over custody matters relating to the Minor. Father also addressed the court directly,

stating he had never hit the Minor at any time and that he made the statement about slapping her only when she had been yelling at him and making disrespectful comments.

The Massachusetts court granted Mother's request to extend the protective order that had been entered against Father. The court rejected the argument that Mother was engaged in improper forum shopping, stating its job pursuant to the applicable Massachusetts statute was to protect the child and that the case was "no different than any other case in Massachusetts where there's a Probate Court order and the Court finds a reasonable fear of imminent serious personal injury and orders there [to be] no contact or a custody change and [the] Probate Court had ordered otherwise before that." And on the basis of the evidence before it, the Massachusetts court found Minor credible and concluded there was a substantial basis on which to conclude she had a reasonable fear of imminent serious personal injury because Father, who the court described as a "sizeable" man, had "lock[ed] her [in his bedroom], tak[en] away her cell phone, [and] threaten[ed] to slap or spank her." In making its findings, the Massachusetts court stated it relied on its observations of Minor's expressions and appearance during the hearing, noting at one point for the record that Minor was shaking and crying.

C.    *Mother's Request in California for Modification of the Existing Custody Arrangement*

Back in California, Mother had filed a request for modification of the child custody and support orders in the superior court case in which those orders had been made in 2009. Instead of joint custody with set periods of visitation with Father, Mother sought sole legal and physical custody of Minor, with only supervised visitation between Father and Minor to occur in Massachusetts.

Mother submitted her own declaration in support of her request for sole custody. Among other things, Mother's declaration recounted what she apparently heard from Minor about the altercation between Father and Andy. It also asked the court to reinstate Father's obligation to pay child support, which had been suspended by the court since

7

2009. Mother's request for a custody modification order made reference to the protective order the Massachusetts court had issued, and in a memorandum of points and authorities accompanying her modification request, Mother argued the family law court must follow Family Code section 3044[2], which establishes a rebuttable presumption that an award of joint custody to a person who has "perpetrated domestic violence" is detrimental to the child's best interest.

Father opposed Mother's request for an order giving her sole custody of Minor and reinstating his child support obligation. He submitted his own counter-declaration, as well as a declaration from his mother (Minor's grandmother). He contended there were no changed circumstances warranting a different custody order, and he argued the Massachusetts proceedings were "tantamount to forum shopping" because "[Minor] was not harmed in any way during the incident nor was she or other family members injured." Father additionally argued there was no basis for the court to reinstate his obligation to pay child support because Mother had not satisfied her burden to allow the court to impute income to him, as he remained unemployed.

The family law court held a hearing on Mother's request to modify the existing custody order over the course of three days in early October 2014. The family law court reviewed the transcripts of both hearings that had been conducted in Massachusetts, and it took testimony from Minor, Mother, Father, and Minor's grandmother. We summarize the relevant aspects of the hearing and highlight certain of the extensive findings made by the family law court during and after the presentation of evidence.

During the first day of the evidentiary hearing, which took place on a Friday, the family law court discussed with the parties what had transpired in the Massachusetts court proceedings. The family law court expressed its belief that "the Massachusetts order was improperly issued" but said it was "not passing judgment on that." The court asked whether the Massachusetts protective order against Father remained in effect, and the

---

[2]    Statutory references that follow are to the Family Code.

parties advised that it was scheduled to expire the following Monday. The court then asked Mother whether she was seeking to extend the order beyond that day (Friday). Mother said she was not, and the parties accordingly stipulated that "the Massachusetts protective order is null and void effective today."

The family law court took testimony from Minor (giving counsel for both parties an opportunity to ask questions) and Minor's grandmother also began her testimony before the court recessed at the end of the day. When the court halted the presentation of evidence, it made interim findings to justify its stated intent to allow Father to visit with Minor over the weekend. Specifically, the court found as follows: "[T]he court does not see that there has been domestic violence perpetrated against the minor child. . . . [¶] The Court believes that the minor child has an agenda. Her agenda is to avoid spending the court-ordered time that the parties previously stipulated to and, in particular, the five weeks during this past summer. Through her indication that she was intimidated or fearful after seeing petitioner have an altercation with his brother-in-law and sister, she was able to work with her mother to get a restraining order from Massachusetts that effectively took father's five weeks of summer [visitation] away. [¶] The child has acknowledged that it was the child's intent that she limit summer vacation time with father, apparently so she could spend time with her mother's family on vacation in Massachusetts. That motivation is not a justification for a domestic violence or related sort of order, which is what happened in Massachusetts."

The family law court also remarked it had "no control over what a Massachusetts court does," but explained it could "reach a different conclusion than the Massachusetts bench officers, and that may be because those bench officers don't have the two volume history of this case. They were not able to speak with the grandmother. They were not able to understand the concept that the child was not locked in the bedroom, as Mother's affidavits repeatedly infer that this child is held a prisoner in a locked bedroom in Father's home. The lock is on the outside of the door, not the inside of the door. I don't know if that was ever made clear to those bench officers."

9

When the parties appeared for the continuation of the evidentiary hearing the following Monday, the family law court heard the remainder of the testimony from Minor's grandmother, testimony from Mother, and the beginning of Father's testimony. The family law court also indicated it had reviewed the transcripts of the proceedings in the Massachusetts court and noted it was perplexed both because there was no discussion during those proceedings of the Uniform Child Custody Jurisdiction and Enforcement Act (UCCJEA) and because the Massachusetts court did not think to confer with the courts in this state before issuing a protective order.[3] The family law court also expressed doubts about the thoroughness of the Massachusetts proceedings, stating at one point that the Massachusetts court "made a finding that [Minor's] fearful because she said, 'I'm fearful,' and then she cried."

The parties concluded the presentation of evidence on the third and final day of the evidentiary hearing, and the family law court gave both sides the opportunity to argue (with rebuttal argument for Mother) before making its ruling. During her argument, Mother's attorney advised the family law court that section 3031 obligated it to determine whether a protective order had been issued before resolving the custody dispute, and she emphasized the Massachusetts court had issued such an order. She also highlighted the impact section 3044 should have on the court's determination: "Family Code 3044 sets forth a rebuttable presumption that it is not in the best interests of a child to award joint custody to a party who has perpetrated domestic violence. Family Code 3044 sub (d)(2) further specifies that a finding of domestic violence by any court is sufficient for the purposes of this statute, whether or not the court has heard the custody proceedings." In his argument, father did not address whether section 3044 was applicable.

---

[3] The family law court asked counsel for the parties if they knew whether Massachusetts had adopted the UCCJEA, but neither attorney was certain. In fact, Massachusetts has not adopted the UCCJEA, being the only state not to have done so to date.

10

After hearing from counsel, the court made extensive factual findings and denied Mother's request to modify the existing joint custody order. Among other things, the court found the altercation between Father and Andy ended after less than one minute and there was no evidence of any injury. Although Minor witnessed the incident, which the family law court characterized as "unfortunate," it found she was not hurt and was not in any danger. At the time Minor began her spring break, according to the court, she had an agenda encouraged by Mother to take steps to eliminate or shorten the upcoming summer visitation. After the incident, Minor felt comfortable enough with Father to confront him about it. The court found that Minor did not fear for her safety at any time while visiting Father, and the court disbelieved Minor's claim she was locked in Father's bedroom.

The family law court stated it found testimony by Father and Minor's grandmother credible, but the testimony by Minor and Mother "sometimes credible and sometimes not credible." In particular, the court "observed [Minor's] demeanor . . . while testifying in this court . . . and believes [Minor's] sometimes emotional state of crying was not caused by a genuine fear of the petitioner, but, instead, was perhaps caused by the anticipation that she would not have the right to decide when and under what conditions she would visit with her father." The court opined: "[Minor] understands that her Father would not physically harm her and would not allow anyone else to do so either. The court believes that the minor child's statement that she's afraid of her father is her way of achieving a modification or elimination of his custodial rights and visitation rights." For these and other reasons, the family law court concluded Minor's best interests would not be served by restricting Father's custodial rights.

The court in its findings and oral ruling made no reference to section 3044, the rebuttable presumption it establishes, or the factors the statute directs courts to consider to determine whether the presumption has been rebutted. In addition, and critically for purposes of this appeal, the family law court relied on section 3040, among other points, in concluding Minor's best interests warranted denial of Mother's request for sole custody: "The court notes that under Family Code section 3040, the petitioner-father is

11

clearly the parent more likely to allow the child frequent and continuing contact with the other parent and that mother is not the parent likely to allow frequent and continuing contact. The court finds that mother's conduct, on the contrary, has been aimed at deterring father's frequent and continuing contact with the child."

The family law court memorialized its findings and ruling in a written order issued after the hearing, which continued the provisions of the stipulated judgment mandating joint custody in full force and effect. Consistent with the court's statement from the bench, the written order includes the court's findings pursuant to section 3040 in connection with its determination of custody and visitation issues. The written order, again consistent with the court's oral ruling, also denies Mother's request to require Father to again pay child support, finding she had not established a basis to impute earnings to Father.

## II. DISCUSSION

The outcome of this appeal turns almost entirely on the dictates of section 3044. The statute establishes a rebuttable presumption that joint or sole custody for a parent who has perpetrated domestic violence is not in a child's best interests. This presumption, which shifts the usual burden of persuasion, need only be rebutted by a preponderance of the evidence. But what a court may not do under the statute—and what the family law court did here—is rely "in whole or in part" on section 3040's preference for frequent and continuing contact with the noncustodial parent. (§ 3044, subd. (b)(1).) We are therefore compelled to reverse the order denying Mother's request for modification of the custody arrangement and to remand to allow the family law court to determine the issue under the proper legal framework. In addition, and although our disposition makes it unnecessary to engage in any extended analysis, we believe it is nevertheless appropriate under the circumstances to reject Mother's contentions that the family law court exhibited gender bias and became embroiled in the proceedings. Last,

12

we hold the family court's determination that Mother failed to carry her burden to reinstate child support payments was not an abuse of its discretion.

### A. The Family Law Court's Custody Ruling

We review a trial court's ruling on a request to modify a custody order for abuse of discretion. (*In re Marriage of Burgess* (1996) 13 Cal.4th 25, 32; *Foster v. Foster* (1937) 8 Cal.2d 719, 730 ["An application for a modification of an award of custody is addressed to the sound legal discretion of the trial court, and its discretion will not be disturbed on appeal unless the record presents a clear case of an abuse of that discretion"].) A family law court abuses its discretion if it applies improper criteria or makes incorrect legal assumptions. (*In re Marriage of Fajota* (2014) 230 Cal.App.4th 1487, 1497; see also *Farmers Insurance Exchange v. Superior Court* (2013) 218 Cal.App.4th 96, 106 ["If the court's decision is influenced by an erroneous understanding of applicable law or reflects an unawareness of the full scope of its discretion, the court has not properly exercised its discretion under the law"].)

#### 1. The family law court's express reliance on section 3040 requires reversal of its custody ruling

Generally, a court makes custody orders concerning minor children pursuant to the best interests of the child standard. (§§ 3011, 3040; *In re Marriage of Brown and Yana* (2006) 37 Cal.4th 947, 955.) In fashioning a custody order, however, a court "is encouraged to make a reasonable effort to ascertain whether or not any emergency protective order, protective order, or other restraining order is in effect that concerns the parties or the minor." (§ 3031, subd. (a).) Where such an order has been made, or where there are other findings that domestic violence involving the parties has occurred, special considerations come into play under the Family Code. (See, e.g., §§ 3011, subds. (a)-(b), 3020, subds. (a), (c), 3044.)

Mother consistently maintained in the family law court, as she does on appeal, that the Massachusetts court's entry of the protective order against Father meant section 3044 must govern the family law court's determination of her request to modify the existing custody order for Minor. When we examine the relevant provisions of section 3044, we conclude she is correct.

"Upon a finding by the court that a party seeking custody of a child has perpetrated domestic violence against the other party seeking custody of the child or against the child or the child's siblings within the previous five years, there is a rebuttable presumption that an award of sole or joint physical or legal custody of a child to a person who has perpetrated domestic violence is detrimental to the best interest of the child, pursuant to section 3011. This presumption may only be rebutted by a preponderance of the evidence." (§ 3044, subd. (a); *Keith R. v. Superior Court* (2009) 174 Cal.App.4th 1047, 1054 ["[A] domestic violence finding [under section 3044] in a family law case changes the burden of persuasion as to the best interest test . . . ."].) Subdivision (c) of section 3044 states a person has "perpetrated domestic violence" within the meaning of subdivision (a) when, among other things, he or she is found to have "placed a person in reasonable apprehension of imminent serious bodily injury to that person or to another."

Section 3044, subdivision (a)'s reference to a finding by "the court" that a person had perpetrated domestic violence was not satisfied by the findings of the family law court in *this* case; the family law court did not believe Father had placed Minor in reasonable apprehension of imminent serious bodily injury. But that is not the end of the matter under section 3044—indeed, far from it.

Section 3044, subdivision (d)(2), which is the provision Mother's attorney cited during her argument to the family law court, states that "[t]he requirement of a finding by the court *shall also be satisfied* if any court, whether that court hears or has heard the child custody proceedings or not, has made a finding pursuant to subdivision (a) based on conduct occurring within the previous five years." (Emphasis added.) Thus, the rebuttable presumption described in section 3044, subdivision (a) necessarily applies if

14

there has been a finding (1) by any court (§3044, subd. (d)(2)); (2) that a person "perpetrated domestic violence . . . against the child," meaning "placed [the child] in reasonable apprehension of imminent serious bodily injury" (§3044, subds. (a), (c)); and (3) that finding was based on conduct occurring within five years of the custody determination being made (§ 3044, subd. (d)(2)).

Putting these statutory provisions together in the context of our facts here, the rebuttable presumption against joint custody for Father (or, more precisely, that joint custody is not in the best interests of Minor) arises because all the statutory requirements are satisfied. The Massachusetts court, which surely qualifies as "any court," expressly found that Father had placed Minor in reasonable apprehension of imminent serious bodily injury.[4] In addition, that finding was based on Father's altercation and related events on April 21, 2014, which was well within the five year timeframe preceding the family law court's ruling on Mother's request to modify custody.

We see no indication in the record that the family law court applied the rebuttable presumption called for by section 3044. Nor is there any indication the family law court expressly considered the statutory factors section 3044 directs a court to consider in determining whether the presumption called for in subdivision (a) has been rebutted by a preponderance of the evidence. (§ 3044, subds. (b)(1)-(7).) Other courts have concluded the absence of such indications in the record is alone sufficient to warrant reversal. (*In re Marriage of Fajota, supra*, 230 Cal.App.4th at pp. 1498-1500; *Christina L. v. Chauncey B.* (2014) 229 Cal.App.4th 731, 737 [reversing where "[n]othing in the order even hints the court applied the presumption of section 3044, or required Father to show by a preponderance of the evidence that it would not be detrimental to grant him custody of the children"].) Here, and owing to the extensive findings made by the family law court, our inclination might have been to parse those findings to determine whether the family law court implicitly considered all of the applicable statutory factors and found the

---

[4]     The Massachusetts court used the term "fear" for "apprehension" and "personal injury" for "bodily injury," but these distinctions are immaterial.

presumption rebutted. But there is no profit in such a task because it is clear there was error here—the family law court expressly relied on a consideration section 3044 forbids.

Section 3044, subdivision (b) states in relevant part: "In determining whether the presumption set forth in subdivision (a) has been overcome, the court shall consider all of the following factors: [¶] (1) Whether the perpetrator of domestic violence has demonstrated that giving sole or joint physical or legal custody of a child to the perpetrator is in the best interest of the child. In determining the best interest of the child, *the preference for frequent and continuing contact with . . . the noncustodial parent, as set forth in paragraph (1) of subdivision (a) of Section 3040, may not be used to rebut the presumption, in whole or in part*." (Emphasis added.) The paragraph of section 3040 to which this provision refers reads as follows: "Custody should be granted in the following order of preference according to the best interest of the child as provided in Sections 3011 and 3020: [¶] (1) To both parents jointly pursuant to Chapter 4 (commencing with Section 3080) or to either parent. In making an order granting custody to either parent, *the court shall consider, among other factors, which parent is more likely to allow the child frequent and continuing contact with the noncustodial parent, consistent with Sections 3011 and 3020*, and shall not prefer a parent as custodian because of that parent's sex. The court, in its discretion, may require the parents to submit to the court a plan for the implementation of the custody order." (§ 3040, subd. (a) [emphasis added].) Because the family law court expressly considered this paragraph in section 3040 when deciding Mother's request for sole custody (*ante*, at p. 11), and because section 3044 prohibits such consideration "in whole or in part," the conclusion is inescapable: the family law court's ruling is predicated on an erroneous understanding of applicable law.

Father's sole argument to the contrary is unavailing.[5] He contends section 3044 has no application here "because the alleged abuse did not occur between [Father] and

<hr>

[5] Father does not defend the family law court's order on the ground that the Massachusetts order was rendered without jurisdiction, and for good reason. (Resp. Br. at 11 ["It is uncontested that the Massachusetts court order was binding"].) In at least one

[Mother], Father and [Minor] or between Father and [Minor's] siblings in the previous five years." Because there is no dispute that the April 21, 2014, altercation between Father and Andy occurred well within five years of the family law court's ruling, we take Father's point to be that there was no finding Father ever hit Minor or that she was injured during the altercation. What Father fails to recognize, however, is that section 3044 defines abuse ("domestic violence" in statutory parlance) to include a situation in which a person places another "in reasonable apprehension of imminent serious bodily injury." (§ 3044, subd. (c).) The Massachusetts court found Father had done just that, and that finding was sufficient to trigger section 3044's presumption—which the family law court did not apply and could not properly have found rebutted.

Because the family law court's decision to deny Mother's request for an order modifying the custody arrangement is infected by legal error, we hold the decision must be reversed as an abuse of the court's discretion. (*In re Marriage of Fajota, supra*, 230 Cal.App.4th at p. 1489; *Christina L. v. Chauncey B., supra*, 229 Cal.App.4th at p. 737.) On remand, the family law court should apply section 3044's rebuttable presumption and expressly address whether Father has rebutted that presumption by a preponderance of the evidence. (*F.T. v. L.J.* (2011) 194 Cal.App.4th 1, 28-29.) Because we reverse only on the ground that the decision was the product of legal error, and because the parties were fully apprised of the section 3044 issue throughout the proceedings (by virtue of Mother's pre-hearing memorandum of points and authorities), the family law court need not preside over a representation of evidence. Rather, after giving the parties an opportunity for further argument, the family law court may decide the matter on the basis of the evidence already presented, exercising its discretion under the correct legal framework and without

instance, the family law court conceded "Massachusetts . . . might technically have the right to make emergency temporary orders . . . ." Other comments made by the family law court, in which it states its view that the Massachusetts order was improperly issued, appear to be predicated on its mistaken belief that Massachusetts had adopted the UCCJEA. (See generally *In re Gino C.* (2014) 224 Cal.App.4th 959, 967 [explaining differences between UCCJEA and the Uniform Child Custody Jurisdiction Act]; *Orchard v. Orchard* (1997) 43 Mass.App.Ct. 775.)

17

any consideration of section 3040, subdivision (a). In doing so, section 3044 places no limitation on the evidence the family law court may consider concerning Minor's best interests, including evidence not considered by the Massachusetts court.[6] (*Keith R. v. Superior Court*, *supra*, 174 Cal.App.4th at p. 1054 ["[A] domestic violence finding in a family law case changes the burden of persuasion as to the best interest test, but it does not limit the evidence cognizable by the court, and it does not eliminate the best interest requirement"]; see also *F.T. v. L.J.*, *supra*, 194 Cal.App.4th at p. 28 [presumption rebuttable even where party has conviction for domestic violence].)

### 2. We reject mother's gender bias and embroilment contentions

Mother contends the family law court denied her due process because it became "embroiled" in the proceedings, meaning personally vested in the outcome, and because it "engaged in pervasive and impermissible gender bias." Because we reverse and remand the matter to the family law court, we need not address these contentions. Given the nature of the allegations and the family law court's task upon remand, however, we find it appropriate to include a short discussion explaining why we believe Mother's contentions lack merit.

Mother asserts that embroilment was demonstrated by the following: "[c]oercing [her] to waive the Massachusetts restraining order," threatening her with "ramifications" and "issuing temporary orders to prohibit Minor from leaving California," "[o]rdering visitation before the hearing concluded," "[e]liciting inadmissible hearsay evidence," "[t]reating the minor child as a hostile witness," announcing its findings prior to the conclusion of evidence, interrupting Mother's testimony to issue additional findings, "[r]epeatedly interrupting [M]other's testimony and confronting her," refusing cross-examination when there was no objection, "[d]isparaging mother and her counsel,"

---

[6] We reject the argument by Mother and amicus that the Massachusetts order must be given collateral estoppel effect. That contention is inconsistent with section 3044, which defines precisely what effect the Massachusetts order has in a California court.

18

refusing to appoint minor's counsel, "[r]efusing to give the hearing precedence, twice continuing it," limiting the scope of Minor's testimony and announcing opinions while mother was excluded, requiring Mother to file an income and expense declaration including her spouse's income, "[r]efusing to apply the domestic violence sections and the Massachusetts order," and accusing Mother of ignoring a prior order and violating Father's due process rights.

Embroilment occurs where a judge "surrenders the role of impartial factfinder/decisionmaker, and joins the fray." (Rothman, Cal. Jud. Conduct. Hand., (3d ed. 2007) § 2.01, p. 37.) The issue perhaps most often arises in contempt proceedings, and cases hold that the critical factor in determining whether personal embroilment has occurred is the character of the judge's response, as reflected in the record. (Compare *Hawk v. Superior Court* (1974) 42 Cal.App.3d 108, 132 [judge's response to misbehavior reflected patience, not personal involvement] with *Betsworth v. Workers' Comp. Appeals Bd*. (1994) 26 Cal.App.4th 586, 599 [embroilment included writing to law firm that employed contemner and also to that law firm's regular client, disparaging contemner's conduct].)

Here, we believe Mother's claim of embroilment fails because it relies on mischaracterizations of the record. In our review of the transcript of the proceedings, for instance, we see no indication "coercion" resulted in the stipulation to declare the Massachusetts court order null and void as of the start of the hearing before the family law court rather than the following Monday. Instead, as the following exchange reflects, the stipulation resulted because Mother stated she had no intention to further extend the order once the proceedings in California were underway:

> THE COURT: What is your understanding as to the purpose of the hearing [in Massachusetts] next week?
>
> [FATHER]: To my understanding, she's trying to extend this protective order again.
>
> THE COURT: Is that correct, ma'am?

19

[MOTHER]:  No, Your Honor.

THE COURT:  Are you seeking to extend the Massachusetts protective order beyond today?

[MOTHER]:  No, Your Honor.  I was just waiting for this court to be able to hear it today.

THE COURT:  Do you stipulate then that the Massachusetts protective order may be null and void effective as of this date?

[MOTHER]:  Yes, Your Honor.  ~(RT 19-20)~

Other of Mother's embroilment allegations are similarly unsupported by the record.

To be sure, the record does in places indicate the family law court was confounded by the Massachusetts court's decision to proceed and issue a protective order without contacting the court of primary jurisdiction in California.  The family law court was also perplexed by Mother's decision to seek orders in Massachusetts rather than California, which enabled the Massachusetts court's perceived lack of comity.  But the record demonstrates the family law court gave both sides a full and fair opportunity to present evidence throughout the hearing, and we do not believe the family law court took on a personal stake in the outcome of the proceedings.  Instead, as the family law court itself remarked at one point:  "The court believes that the Massachusetts order was improperly issued, although I'm not passing judgment on that.  It seems like that is now water under the bridge."

As for gender bias, Mother argues the family law court utilized improper gender-based stereotypes in resolving the case.  First, she asserts the court characterized Minor as a "hysterical, privileged teenager" and accused her of having an agenda and a sense of entitlement and resentment, all of which she contends are "loaded terms" that "reveal the court's biases."  Second, she claims the family law court "applied gendered stereotypes regarding domestic violence" in reaching its decision, namely, "minimiz[ing] the largely admitted facts of violence," assuming Minor would have told Mother about the

20

altercation sooner if in fact she were afraid, and faulting Minor for spending time with Father after the altercation.

Again, our view of the record differs from Mother's characterization. Her claim, for example, that the court labeled Minor "hysterical" is unsupported by a citation to the record, and our review has not uncovered instances where the family law court so described the child. In addition, while it is certainly true that victims of domestic violence do not always react to such violence in the same way—which often legitimately explains delays in reporting abuse—we see no indication that the family law court's extensive findings, based in part on its assessment of witness credibility (including a finding Minor's grandmother was a credible witness), were the product of an unthinking application of stereotypes based on gender.

Indeed, the record here is not at all like the facts present in cases Mother cites in support of her position. In *In re Marriage of Iverson* (1992) 11 Cal.App.4th 1495, for instance, the court found a family law court exhibited impermissible gender bias based a number of inappropriate statements: that the wife was a "lovely girl," but "[h]ad nothing going for her except for her physical attractiveness"; that she "did not have much of an education, and did not have much of a background in business, and did not have much by way of material wealth"; and that the husband had just gone through a divorce and would not have contemplated marriage because he would not "buy the cow when you can get the milk free, as we used to say." (*Id.* at pp. 1498-1500.) We see nothing roughly comparable in our record here, and we reject Mother's claim the family law court's decision was infected by gender bias.

C. *The Denial of Mother's Request to Reinstate Child Support Payments Was Not an Abuse of Discretion*

Father's child support obligations were suspended during the family law proceedings in 2009 because he was unemployed. Mother asserted that she did not know if Father was currently employed, but believed he earned $37,000 per year before 2009.

21

~(CT 15)~ Father's income and expense declaration stated that he did not work, and had been unemployed since 2009.

Mother contends the trial court abused its discretion by refusing to order Father to resume paying child support. She contends the previous order required Father to pay $650 a month, and that the court should have imputed income to Father to justify reinstating payment obligations. Father argued there was no material change in his financial circumstances to warrant a change in child support. Father was to begin a vocational training program studying network security in October 2014, and the program was expected to last until January 2015. The trial court found that Mother had not sufficiently established a basis to impute income to Father.

If a parent is unwilling to work despite the ability and the opportunity, earning capacity may be imputed to that parent. (*In re Marriage of Padilla* (1995) 38 Cal.App.4th 1212, 1217 (*Padilla*).) The court in *Padilla* explained the three-part test established in *In re Marriage of Regnery* (1989) 214 Cal.App.3d 1367 governs the circumstances under which a court may utilize a parent's earning capacity rather than actual income in computing child support. (*Padilla*, *supra*, at pp. 1217-1218.) "'Earning capacity is composed of (1) the ability to work, including such factors as age, occupation, skills, education, health, background, work experience and qualifications; (2) the willingness to work exemplified through good faith efforts, due diligence and meaningful attempts to secure employment; and (3) an opportunity to work which means an employer who is willing to hire.'" (*Id*. at p. 1218.) A parent that seeks modification of an existing child support order has the burden to establish a change in the status quo is warranted. (*In re Marriage of Bardzik* (2008) 165 Cal.App.4th 1291, 1294 ["If one parent seeks to modify an existing order so as to have income imputed to the other parent, the parent seeking imputation—that is, in that context, the parent seeking to overturn the status quo—bears the burden of proof of showing that the other parent has the ability and opportunity to earn that imputed income"] (italics omitted).)

22

Here, the family law court was entitled to conclude the rather bare-bones evidentiary showing Mother made was inadequate to change the status quo and impute income to Father under the three-part *In re Marriage of Regnery* test. Mother did little to address whether Father had the ability to work based upon his age, education, and skills; whether Father had failed to obtain work in line with his qualifications; and whether he had foregone an opportunity to work. On the other hand, Father stated that he was attending vocational training that he expected to complete in several months. With only these facts before it, the trial court did not abuse its discretion in denying—without prejudice—her request to reinstate payments at the time of the evidentiary hearing.

## DISPOSITION

The order of the superior court denying without prejudice Mother's request to reinstate child support payments is affirmed. In all other respects concerning custody and visitation, the superior court's order is reversed and the matter remanded for further proceedings consistent with this opinion. The parties shall bear their own costs on appeal.


BAKER, J.


I Concur:



KRIEGLER, J.



23

Jonathan C. Ellis v. Crystal Griggs

B264040

TURNER, P.J., Concurring

I concur in the judgment including the analysis concerning the meritless attack on the integrity of the family law court. I write separately to explain why I believe the limited reversal and remand is warranted. It is presumed a trial court knows the law and has applied it. (Evid. Code § 664; *People v. Sullivan* (2007) 151 Cal.App.4th 524, 549-550.) But here, the family law court's findings made no reference to Family Code section 3044 which, as my colleagues correctly note, is the controlling issue. Thus, in my view, the presumption the trial court applied the law is overcome by the absence of any findings directed at the crucial issue before the family law court. But, how to resolve the dispute's merits is a matter to be left in the good hands of the family law court.

TURNER, P. J.

**CERTIFIED FOR PARTIAL PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| JONATHAN C. ELLIS, | B264040 |
| Respondent, | (Los Angeles County Super. Ct. No. KF004785) |
| v. | |
| CRYSTAL L. LYONS, | ORDER MODIFYING OPINION AND CERTIFYING OPINION FOR PARTIAL PUBLICATION |
| Appellant. | |

THE COURT:

It is ordered that the majority opinion filed on July 14, 2016, be modified as follows: On page 7, in line 12, "whom" shall be substituted for "who." On page 20, "~(RT 19-20)~" is deleted. On page 21, "on" shall be inserted after "based" in line 12; the letter "B" shall be substituted for the letter "C" in the subheading; and "~(CT 15)~" is deleted.

So modified, and good cause appearing, it is ordered that the majority opinion be published in the official reports with the exception of Parts II.A.2 and II.B. The concurring opinion is certified for publication in full.

There is no change in judgment.

_____
BAKER, J.                    TURNER, P.J.                    KRIEGLER, J.