Filed 2/2/18

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re J.G. et al., Persons Coming Under the Juvenile Court Law. | |
| IMPERIAL COUNTY DEPARTMENT OF SOCIAL SERVICES, | D072293 |
| Plaintiff and Respondent, | (Super. Ct. No. JJP03219-22) |
| v. | |
| M.G., | |
| Defendant and Respondent; | |
| J.G. et al., | |
| Appellants. | |

APPEAL from orders of the Superior Court of Imperial County, William D. Quan, Judge. Reversed.

Henderson and Ranasinghe and Kelly Ranasinghe for Plaintiff and Respondent.

Childers and Associates, Ryan D. Childers and Kevin Lawless for Defendant and Respondent.

Neale B. Gold, under appointment by the Court of Appeal, for Appellants, Minors.

Minors N.C., P.G., J.G., and D.G. appeal from orders denying the Imperial County Department of Social Services' petition to remove them from the care of their paternal aunt under Welfare and Institutions Code sections 387 and 361.3.[1]  Minors contend that in view of the court's finding that the three youngest children were diagnosed with nonorganic failure to thrive while in their aunt's care, the court erred in determining that continued placement with their aunt was appropriate and in their best interests.  We agree and conclude that the court abused its discretion in ordering the children to remain with a caregiver who failed to provide adequate food to them, causing serious injury to the health and well-being of the three youngest children.  We therefore reverse the findings and orders of the juvenile court.[2]

## FACTUAL AND PROCEDURAL BACKGROUND

In November 2014, the Imperial County Department of Social Services (the Department) detained N.C.,[3] P.G., J.G., and D.G. (collectively, the children) in protective custody after their father, Jose G., ran over their mother, D.H., with his car when she tried to prevent him from leaving with the children.  The children were present and witnessed

---

[1]    Further unspecified statutory references are to the Welfare and Institutions Code.

[2]    We grant County Counsel's unopposed request for judicial notice of minute orders of October 11 and November 13, 2017, placing the children with relatives in Virginia and suspending visitation between Aunt and N.C.

[3]    N.C. did not know her alleged father, who has been incarcerated during most of her life.  In this opinion, for brevity, and because no party has raised the issue of N.C.'s lack of a biological relationship with her siblings' father and aunt, we do not distinguish N.C.'s status from those of her siblings.

this incident. N.C. was four years old, P.G. was 22 months old, and twins J.G. and D.G. were 10 months old. D.H. died from her injuries a few days later. Jose was sentenced to seven years in prison.

Jose's sister, M.G. (Aunt), who had adult children and grandchildren of her own, immediately requested placement of all four children. The three youngest children were placed with Aunt in February 2015. N.C. was initially placed with her maternal relatives but joined her siblings in Aunt's home approximately six months later. One of Aunt's daughters, U.W., lived with her and helped care for the children. The court ordered a monthly weekend visit for the children with their maternal relatives.

At the beginning of the case, the social worker was concerned about four-year-old N.C.'s emotional stability. N.C. described the events leading to her mother's fatal injury and other incidents in which Jose had hit her mother and all of the children. The social worker referred N.C. to therapeutic services. There were no other concerns about her health or development.

P.G. had Down syndrome. She had low muscle tone and was not yet walking. Her immune system was fragile and she was susceptible to respiratory illnesses. In March 2015, shortly after she was placed in Aunt's care, P.G. measured close to the 90th percentile for weight on a pediatric growth chart for Down syndrome children.

J.G. and D.G. were diagnosed with developmental delays but there were no concerns about their physical health. At a pediatric checkup in December 2014, when the boys were 10 months old, the doctor noted that D.G. was overweight at 23.3 pounds.

3

J.G. weighed 26.8 pounds. At a medical checkup in August 2015, the service provider noted that J.G. was overweight. He weighed 24 pounds.

In September 2015, at a hearing, the children's maternal grandmother told the court that the children were thin and malnourished in Aunt's care. Aunt complained that the maternal relatives were improperly feeding the children by allowing them to eat too much food and junk food. The social worker addressed the issue with the maternal relatives.

P.G. continued to suffer from respiratory problems, including pneumonia. In June 2016, she was determined to have severe pharyngeal phase deficits and was aspirating thin liquids. Doctors recommended that Aunt give only thickened liquids to P.G., to prevent aspiration. Aunt did not follow this medical advice. At a physical therapy session, Aunt complained that P.G. had gained four pounds in a 48-hour visit with her maternal relatives and that her stomach was "very extended," saying, "food is a part of her addiction." Aunt took P.G. to the emergency room for treatment for constipation.

In July 2016, the court terminated parental rights. Aunt wanted to adopt the children and initiated a home study. The social worker reported that P.G., D.G., and J.G. (collectively, the younger children) were making developmental progress. Aunt was attentive and proactive, and she had obtained needed services for the children.

In September 2016, the Department reported that P.G. had more control over her movements and was walking. She continued to have respiratory problems. Aunt had been diligent in securing needed services for P.G., including teaching her how to swallow without aspirating food and liquid into her lungs. Aunt closely monitored P.G. during

4

meals. The other three children were in good health. D.G. and J.G. were making developmental progress. The social worker said that the children showed signs of having secure and positive attachments to Aunt. After the court terminated parental rights, Aunt had stopped the children's visits with their maternal relatives.

On October 17, 2016, a San Bernardino County social worker and public health nurse (PHN) investigated a child abuse referral that alleged that P.G. had bruises on her forehead, rib, and lower back, and that her right knee was pink and swollen. Aunt and teachers at P.G.'s day care reported that P.G. frequently fell down. A bus driver confirmed Aunt's report that P.G. fell on the morning of October 17 when she stepped off the curb to board the school bus. On examination, P.G.'s abdomen was determined to be grossly distended. Her arms, legs, and ribs were visibly bony, and the skin on her buttocks was sagging. She was very lethargic. P.G. was hospitalized to evaluate the cause of her apparent failure to thrive.

The social worker and PHN examined the other children. D.G. was thin but not bony. Both D.G. and J.G. were nonverbal. Six-year-old N.C. said that they ate chicken, rice, beans, and eggs, and that there was always food in the home. Nevertheless, D.G. weighed only a pound more than he had weighed at age 10 months, almost two years earlier, and J.G. weighed less than he had weighed at 10 months. A preschool teacher reported that Aunt had restricted P.G.'s diet at preschool to mainly fruits and vegetables, and had limited the number of goldfish crackers that P.G. could have as a reward for her accomplishments. Aunt explained that the diet was designed to prevent P.G. from aspirating her food.

5

The Department filed a supplemental petition on behalf of the children under section 387, alleging that placement with Aunt had not been effective in protecting them. The petition stated that Amy Young, M.D., had diagnosed the younger children with failure to thrive. P.G. was hospitalized with severe malnutrition. N.C.'s safety and well-being were at risk because of the inadequate care of her siblings. With the court's approval, the Department detained the children in protective custody in the care of Aunt's adult daughter, U.W. The court ordered reasonable visitation with Aunt.

At the uncontested jurisdictional hearing under section 387, the court admitted the Department's report in evidence and sustained the petition by a preponderance of the evidence. The court ordered Aunt to undergo a mental health evaluation.

The dispositional hearing started on April 4, 2017, and concluded on May 31, 2017. The court admitted into evidence the Department's reports, which included the children's medical records. The Department recommended removing the children from Aunt's care. The attending physician stated that P.G. was hospitalized for severe protein malnutrition secondary to insufficient caloric intake. Aunt told medical staff that P.G.'s abdominal distention was caused by eating too much food at daycare. Aunt said that she gave hard-boiled eggs and protein shakes to P.G at breakfast, and chicken at dinner, but that P.G. was a picky eater. However, the attending physician reported that during her hospitalization, P.G. had a vigorous appetite and consumed 100 percent of the food that was offered to her. She was gaining weight. This suggested that she had not been receiving an adequate number of calories prior to admission.

6

The Department reported that N.C., D.G., and J.G. were initially placed with U.W. in Aunt's home. They were removed from that placement and, after another failed placement, were living together and doing well in a foster care home. P.G. was in a different foster care home. The children were healthy and had gained weight and length since they were removed from Aunt's home and detained in foster care. P.G. was walking and moving. She no longer appeared to be lethargic. By March 2017, P.G. was in the 95th percentile for weight, and her health had improved. D.G. and J.G. were also in the 95th percentile for weight. The social worker said that Aunt continued to insist that the children were obese at their current weights and that Aunt did not understand the severity of the failure to thrive diagnoses.

In March 2017, the Department notified Aunt that her home no longer qualified for relative placement and that she would have to reinitiate the process for home approval if the court were to order the children to remain in her care. The social worker reported that an interstate evaluation of the home of maternal relatives was pending. The maternal relatives, who were licensed foster care parents with an approved adoptive home study, had visited the children and wanted to adopt them.

Dr. Young testified that she is board certified in child abuse pediatrics. In October 2016, P.G. was admitted to Loma Linda Hospital for an evaluation of the conditions contributing to her failure to thrive. There was little subcutaneous fat on P.G.'s body. Her backbone and ribs were prominent, her abdomen was distended, and her bowels were impacted. She had wasting of muscle and fat. There was lanugo (fine hair) everywhere on P.G.'s skin, which was caused by a stress response to malnutrition. Dr. Young said

that P.G. had dropped from the 90th percentile in weight in March 2015 to below the fifth percentile in weight at the time of her hospital admission. The drop from the 90th percentile to the fifth percentile was an extreme case of failure to thrive. P.G. was dehydrated and suffering from protein malnutrition, which was measured by the low level of albumin in her blood. Her distended abdomen was a symptom of both calorie and protein deficiency. P.G. was "fairly weak" when she was first hospitalized. Her strength began to improve with proper nutrition.

During her 12-day stay in the hospital, P.G. gained 5.5 pounds. Dr. Young said that this was extraordinary weight gain and pointed to inadequate nutrition as the cause of P.G.'s failure to thrive. Failure to thrive at P.G.'s age was especially pernicious because it occurred during a period of significant brain development and rapid brain growth. In addition, heart issues could be exacerbated by malnutrition. Like many Down syndrome children, P.G. has a heart murmur.

By the end of her hospital stay, P.G. was approaching the 50th percentile in weight. After her release from the hospital, P.G. lost weight because her caregiver at that time, U.W., was controlling her food portions. At a meeting, U.W. agreed to not control the amount of food that P.G. was permitted to eat. However, after speaking with Aunt, U.W.'s demeanor changed and she said that she was going to continue giving small portions to the children to control the amount of food that they ate.

Dr. Young diagnosed D.G. and J.G. with nonorganic failure to thrive. At 33 months, J.G. weighed less than he had weighed at 10 months of age. D.G. weighed a pound more than he had weighed at 10 months. They had fallen off the growth curve and

were now in the fifth percentile in weight. D.G. and J.G. both had postgrowth arrest lines on their bones, which happens when the body stops building bone in response to the stress of disease or malnutrition. In addition, D.G. and J.G. both displayed food insecurity. They were desperate to hold snacks. They cried the minute they finished eating or if someone would try to briefly hold their snack. They ate food that had fallen on the floor. By February 2017, J.G. had gained 10 pounds in foster care. However, he had not yet caught up in height to where he had been on the growth chart at 10 months. D.G.'s height and weight had returned to the normal range.

Dr. Young testified that P.G., D.G., and J.G. were suffering from severe malnutrition caused by poor diet, specifically, insufficient calories and protein. In layman's terms, this meant that they were starving. Their growth had essentially stopped. Dr. Young said, "this case definitely stands out as a more severe case [of failure to thrive], particularly given that all three children had such significant loss in growth potential."

Social worker Therese Vogel was assigned to the children's cases in August 2016. She had no concerns about Aunt's home or the children's conditions. Vogel saw the children every month. In October, she went to see P.G. at preschool. P.G. was very lethargic. Aunt said that she had noticed that P.G. had lost weight and that she had started to give protein shakes to her. Vogel believed that Aunt would benefit from nutrition training. However, services were not offered to Aunt because the Department decided not to return the children to her care.

9

Social worker Luis Castro testified that there were guidelines for P.G.'s diet because she was aspirating her food, leading to respiratory infections. Aunt was upset with P.G.'s daycare. She believed that the food that they were giving to her was too high in carbohydrates. Aunt was concerned that the diet at daycare would cause P.G. to become overweight. Aunt worried about the children's diet during their weekend visits with their maternal relatives. Aunt constantly asked to stop the visits because of her concerns about the children's diet. She complained that the maternal relatives gave the children birthday cake, chips, and soda. The maternal relatives believed that the children were losing weight and that Aunt was not providing proper nourishment to them.

Castro observed the children eating lunch at Aunt's home. They had peanut butter sandwiches, milk, and grapes. J.G. appeared to be very anxious to eat. Castro said that the children "were very measured as far as bites they would take and the amount of time they would take to eat . . . it's just not something I observe usually with children of that age. . . . It stuck in my mind how proud they were as far as taking each little bite and chewing and drinking a little bit of milk, very proper."

Jason Kornberg, M.D., performed a psychiatric evaluation of Aunt. He testified that Aunt had an adjustment disorder. He opined that Aunt posed a risk to the children because she denied any wrongdoing with respect to their diagnoses of failure to thrive. Dr. Kornberg concluded that psychiatric treatment was not likely to be of much benefit. Aunt minimized the children's symptoms and lacked insight into the significance of the children's weight loss.

Stephanie Fisher provided infant education services to P.G., D.G., and J.G. Fisher taught gross motor skills and language skills to P.G. twice a week from March 2015 until P.G. aged out of the program in January 2016, at age three. Fisher provided language skills to D.G. and J.G. from the summer of 2015 to January 2016. She also worked with the younger children on eating skills. P.G. was very good with utensils. Fisher often saw the younger children at breakfast. They ate cereal, eggs, and fruit. Aunt fed snacks such as Cheerios or cut up vegetables to them. The refrigerator and cupboards were full of food.

The parties stipulated that if the children's babysitter were called to testify, she would testify that she was in Aunt's home four days a week and that the children were always well-fed.

Jeffrey Warren, Ph.D., conducted a psychological assessment of Aunt. Dr. Warren had a doctorate in clinical psychology, with specialized training in child abuse identification and treatment. He interviewed Aunt, administered standard psychological testing, reviewed case reports and the children's medical records, and spoke with Aunt's treating psychologist. Dr. Warren concluded that Aunt was an extremely well-adjusted person in view of the number of stressors in her life. She did not have any personality issues and was highly functional.

Dr. Warren said that Aunt was well bonded to the children. She had obtained medical care and services for four challenging children. When the children were placed with Aunt, they were largely obese. Aunt worked to bring the children's weight down by feeding healthy foods to them. She took full responsibility for, and was proud of,

11

reducing the children's weight. Aunt did not believe that she had made any mistakes with the children's diets. She had intended to significantly reduce the children's weight.

Aunt testified that when the children were placed with her, P.G. was two years old. She was not able to stand and had no communication skills. P.G. was not eating solid food. Her stomach was distended and she struggled with constipation. Aunt accessed WIC [The Special Supplemental Nutrition Program for Women, Infants, and Children][4] services and closely followed WIC guidelines in feeding the children.

The children were in day-long daycare until February 2016, when Aunt stayed home to recover from a work-related injury. P.G. started attending an early childhood special education program in the mornings. N.C. was in school. D.G. and J.G. were at home. Aunt was responsible for all the children's meals, except for P.G.'s breakfast, which was provided to her at her special education program, and N.C.'s school meals. Aunt fed fresh fruit and vegetables, preferably organic, to the children. Everything was cooked from scratch. She did not give them processed food. Snacks included frosted mini-wheats, fruit, milk, and string cheese. Aunt said that her goal was to provide a healthy diet to the children, not to cause them to lose weight. If anyone had told her to give more food to the children, she would have done so. A pediatrician who examined P.G. on September 15, 2016, did not express any concerns about her weight. In August 2016, Aunt felt that P.G.'s weight was low and started giving her plant based protein

---

4     WIC provides federal grants to states for supplemental foods, health care referrals, and nutrition education for low-income pregnant and postpartum women, and to infants and children up to the age of five who are found to be at nutritional risk. (See <https://www.fns.usda.gov/wic/women-infants-and-children-wic>, as of 02/02/2018.)

shakes. Aunt testified that the children's weight loss was not intentional. She was just following WIC guidelines. She wished someone would have told her that the children were losing too much weight.

The court found that there was no doubt that P.G., D.G., and J.G. were diagnosed with nonorganic failure to thrive. Although Aunt had issues in providing proper and effective care to the children and facilitating visitation with relatives, the other factors listed in section 361.3 were favorable to her. Those factors included the placement of the siblings in the same home, Aunt's good moral character, the nature and duration of the children's relationships with her, her ability to obtain needed services for them, her willingness to adopt the children, and her ability to arrange for child care. There was no evidence of intentional harm to the children sufficient to cause the court to believe that the children could not be returned to Aunt with appropriate services. The court found that it was in the children's best interests to remain in Aunt's care with appropriate services to mitigate risk, including monthly visits by the social worker, monthly pediatric checkups for the children, and psychotherapy for Aunt.

County Counsel advised the court that the children could not be returned to Aunt's care until the Department relicensed her home, and that, due to the children's near starvation while in her care, Aunt was registered on the child abuse index. The court stated, "The Court's order is I do not find that . . . the children should be removed from the placement. However, if the children cannot be placed there because of a licensing issue, then [Aunt] needs to get through that process first."

13

DISCUSSION

Appellant Minors assert that the court erred when it determined that continued placement with Aunt was appropriate and in their best interests. They argue that a home in which they almost starved is not a safe home. Minors contend that the court's findings under section 361.3 are not supported by substantial evidence because: Aunt is a child abuser who is listed on the Child Abuse Central Index (CACI); the evidence is uncontroverted that she was unable to provide a safe home, proper and effective care to the children; and her home was unsafe and is no longer licensed as a placement option. Minors also contend that the court erred when it determined that there are reasonable means to protect the children in Aunt's care. They argue that this standard applies only to a child's removal from his or her parent under section 361, subdivision (c), and does not apply to removal from a relative pursuant to section 387.

The Department joins with the Minors' arguments that the court erred when it continued the children's placement with Aunt. The Department emphasizes that the court made an uncontested true finding at the jurisdictional hearing that the younger children were diagnosed with nonorganic failure to thrive, and maintains that the court's order continuing the children's placement with Aunt does not accurately account for the severity of the malnutrition that the three younger children suffered in her care. The Department argues that provision of services is not likely to make Aunt's home safe for the children in view of her insistence that she did nothing wrong with respect to the children's diets. In addition, the Department contends that the court did not have the

14

authority to order the children's continued placement with a person who is registered on CACI.

Aunt contends that there is substantial evidence to support the court's findings. Aunt notes that the record shows that she frequently took the children to medical appointments and did not try to hide them from anyone. She also points to Dr. Warren's testimony which, she argues, provides substantial evidence to show that Aunt is psychologically fit and able to safely parent the children, as well as to the social workers' testimonies that the children were thriving in Aunt's care and were bonded to her, and that she secured services to address their many special needs. Aunt argues that the evidence does not show that she intentionally deprived the children of a nutritionally sound diet. On the contrary, she maintains, there is substantial evidence to show that she wanted to ensure that the children had healthy diets but that her good intentions resulted in unintended consequences for the children. Aunt argues that the lack of licensing of her home, and her listing on CACI, which she is currently litigating, do not prevent the court from ordering the continued placement of the children in her care.

A

*Applicable Legal Principles*

When the Agency seeks to change the placement of a dependent child from relative care to a more restrictive placement, such as foster care, it must file a supplemental petition under section 387. A supplemental petition "shall contain a concise statement of facts sufficient to support the conclusion that the previous disposition has not been effective in the rehabilitation or protection of the child or, in the

15

case of a placement with a relative, sufficient to show that the placement is not appropriate in view of the criteria in [s]ection 361.3." (§ 387, subd. (b).)

The Agency has the burden to show by a preponderance of the evidence that the factual allegations in the petition are true. If the court finds that the factual allegations are true, the court holds a dispositional hearing on the need to remove the children from their current level of placement. (*In re Javier G.* (2006) 137 Cal.App.4th 453, 460.) Bifurcating the jurisdictional and dispositional hearings under section 387 is discretionary. (*In re Miguel E.* (2004) 120 Cal.App.4th 521, 542 (*Miguel E.*).)

In the case of removal from a relative caregiver, the court considers the factors listed in section 361.3, subdivision (a). As relevant here, these factors include, but are not limited to: the child's best interest; the wishes of the relative and child; placement of siblings in the same home; the good moral character of the relative and any other adult living in the home, including whether any individual residing in the home has been responsible for acts of child abuse or neglect; the nature and duration of the child/relative relationship; and the relative's desire to care for the child and provide permanency. (§ 361.3, subd. (a)(1)-(6).) The court also assesses the relative's ability to provide a safe, secure, and stable environment for the child; exercise proper and effective care and control of the child; provide a home and the necessities of life to the child; facilitate visitation with the child's other relatives; provide legal permanence; and arrange for appropriate and safe child care. (§ 361.3, subd. (a)(7)(A)-(I).)

The court must also consider the safety of the relative's home. (§ 361.3, subd. (a)(8); see §§ 361.2, subd. (e), 361.4, 16519.5 [home approval requirements].) Child

16

safety and well-being are not achieved merely by ensuring the home is free from physical hazards and persons with disqualifying criminal and child abuse records. They are also dependent on the family's psychosocial history, which includes consideration of physical and mental health, substance abuse, violence, and experience caring for children. (§ 16519, subd. (c).)

B

*Standard of Review*

The parties assume that a relative placement decision under section 361.3 is reviewed under the substantial evidence standard of review. Our research, however, shows that reviewing courts, including this court, have applied both the substantial evidence and the abuse of discretion standards in reviewing a court's decision under section 361.3. (See, e.g., *In re E.T.* (2013) 217 Cal.App.4th 426, 438-439 [abuse of discretion]; *In re Sabrina H.* (2007) 149 Cal.App.4th 1403, 1420-1421 (*Sabrina H.*) [abuse of discretion]; *Miguel E.*, *supra*, 120 Cal.App.4th at p. 548 [substantial evidence]; *In re A.O.* (2004) 120 Cal.App.4th 1054, 1061 [substantial evidence]; *Alicia B. v. Superior Court* (2004) 116 Cal.App.4th 856, 863-864 [abuse of discretion]; *In re Luke L.* (1996) 44 Cal.App.4th 670, 680 [abuse of discretion]; *In re Sarah S.* (1996) 43 Cal.App.4th 274, 286 [abuse of discretion]; *In re Robert L.* (1993) 21 Cal.App.4th 1057, 1065-1067 (*Robert L.*) [abuse of discretion]; *In re Joel H.* (1993) 19 Cal.App.4th 1185, 1200 [substantial evidence].)

We conclude that the appropriate standard of review of relative placement orders under section 361.3 is abuse of discretion. First, the abuse of discretion standard has long

17

applied to review of parental custody and visitation orders in family law and dependency cases. (See, e.g., *Foster v. Foster* (1937) 8 Cal.2d 719, 730; *Ellis v. Lyons* (2016) 2 Cal.App.5th 404, 415) In addition, in dependency cases, our judicial district has long reviewed a finding of the child's best interest under the abuse of discretion standard. (*In re Kimberly F.* (1997) 56 Cal.App.4th 519, 535 (*Kimberly F.*)

In concluding that abuse of discretion was the appropriate standard of review for a relative placement order under section 361.3, the *Robert L.* court stated, "[i]t would seem obvious that, if there were *no* evidence to support the decision, there would be an abuse of discretion. But we do not think that it follows that there can be no abuse of discretion if there be any evidence to support the decision. It is certainly true that there could be a case where the decision is obviously not for the best interests of the child, even though there is some evidence to support it." (*Robert L.*, *supra*, 21 Cal.App.4th at pp. 1065-1067.) We agree with this reasoning.

Under the abuse of discretion standard, the court is given wide discretion and its determination will not be disturbed absent a manifest showing of abuse. (*Sabrina H.*, *supra*, 149 Cal.App.4th at pp. 1420-1421.) "Broad deference must be shown to the trial judge." (*Robert L.*, *supra*, 21 Cal.App.4th at p. 1067.) However, "[t]hat deference comes with two related caveats." (*Williams v. Superior Court* (2017) 3 Cal.5th 531, 540 (*Williams*).) First, the scope of discretion lies in the particular law to be applied. " 'Action that transgresses the confines of the applicable principles of law is outside the scope of discretion and we call such action an "abuse" of discretion.' " (*Ibid.*) Second,

"[a]n order that implicitly or explicitly rests on an erroneous reading of the law necessarily is an abuse of discretion." (*Ibid.*)

Here, the particular law to be applied is an assessment of specific statutory factors under section 361.3, including a determination of the child's best interests. The best interests of the child standard is not a simple concept. The court must assess a number of factors, including the seriousness of the reason for child's removal from his or her home, and the strength of the child's relationships with family members and caregivers. (*Kimberly F.*, *supra*, 56 Cal.App.4th at pp. 530-531.) In reviewing a finding that a change of placement is in the child's best interests, we keep in mind the Legislature's mandate to "provide maximum safety and protection for children who are currently being physically, sexually, or emotionally abused, being neglected, or being exploited, and to ensure the safety, protection, and physical and emotional well-being of children who are at risk of that harm." (§ 300.2.)

C

*The Court Abused Its Discretion in Determining That the Children's Placement with Aunt Is in Their Best Interests*

Aunt correctly states there is substantial evidence to support the court's findings that she secured appropriate services for the children's special needs and that the children were bonded to her. The evidence shows that Aunt took the children for medical care and sent N.C. and P.G. to school. Aunt is also correct that the current lack of licensing of

19

her home[5] or the existence of a child protective history[6] do not prevent the court from considering the children's placement with her under section 361.3. Further, although there is ample evidence in the record to the contrary, we do not dispute Aunt's claim that there is substantial evidence to support a finding that Aunt did not have any significant psychological issues that would prevent her from properly caring for the children. The evidence also shows that Aunt is willing to adopt the children.

Nevertheless, we are not persuaded by Aunt's argument that the court did not err when it ordered the children's continued placement in her care. The court is required to consider the ability of the relative to provide a safe environment for the child, exercise proper and effective care of the child, and provide the necessities of life for the child. (§ 361.3, subd. (a)(7).) We reject the court's findings that the children could be safely maintained in Aunt's care and that there is not sufficient evidence to show that Aunt intentionally harmed them.

Under section 300, subdivision (b), the willful or negligent failure to provide the child with adequate food is a ground for dependency jurisdiction. In enacting the Child Abuse and Neglect Reporting Act (Pen. Code, § 11164 et seq.), the Legislature

---

[5]    This court has held that an agency's withdrawal of approval of a relative's home "does not constitute substantial evidence that the previous disposition was not effective or that the placement was not appropriate under the criteria in section 361.3." (*Miguel E.*, *supra*, 120 Cal.App.4th at p. 547.) Agency approval of the home is just one of the factors that the court considers. (*Ibid.*)

[6]    This court and our colleagues in Division Three have held that a prior child protective history does not bar a relative from being evaluated and considered for placement of a dependent child under section 361.3. (*In re Antonio G.* (2007) 159 Cal.App.4th 369, 378; *Cesar V. v. Superior Court* (2001) 91 Cal.App.4th 1023, 1033.)

20

criminalized "the negligent treatment or the maltreatment of a child by a person responsible for the child's welfare under circumstances indicating harm or threatened harm to the child's health or welfare."[7] (Pen. Code, § 11165.2, subd. (a).) The term "neglect" includes both acts and omissions on the part of the responsible person. (*Ibid*.; see *In re Ethan C.* (2012) 54 Cal.4th 610, 627-629 [defining neglect in dependency cases].) The noun "neglect" is alternately described as " '[t]he omission of proper attention to a person or thing, whether inadvert, negligent, or willful; the act or condition of disregarding,' " or " '[t]he failure to give proper attention, supervision, or necessities, esp. to a child, to such an extent that harm results or is likely to result.' " (*In re Ethan C.*, at pp. 627-628, citing Black's Law Dictionary (8th ed. 2004), p. 1061, col. 1.) In addition, the Legislature defines "severe neglect" as "the negligent failure of a person having the care or custody of a child to protect the child from severe malnutrition or medically diagnosed nonorganic failure to thrive." (Pen. Code, § 11165.2, subd. (a).)

The record clearly shows that Aunt failed to provide P.G., D.G., and J.G. with adequate food and that she *intentionally* limited the children's food portions. As a result, the younger children were diagnosed with nonorganic failure to thrive. P.G. was severely malnourished, dehydrated, and lethargic, and had to be hospitalized for almost two weeks. D.G. and J.G. were also severely malnourished. They had postgrowth arrest lines on their bones, which occurs when the body stops building bone in response to malnutrition. D.G. and J.G. displayed food insecurity. Dr. Young testified that P.G.,

---

7    We do not suggest that any of the juvenile court's findings in this case meets the standard of proof required in criminal cases.

D.G., and J.G. essentially stopped growing. In addition, she believed that malnourishment may have affected their brain development. Dr. Young said that the younger children all had significant loss in growth potential. She characterized Aunt's treatment of them as "starvation."

The record shows that Aunt willfully failed to provide the younger children with adequate food and nutrition, resulting in their diagnoses of severe malnutrition and nonorganic failure to thrive. That Aunt may have lacked the intent to harm the children does not mitigate her failure to provide adequate food to them. (§ 300, subd. (b).) We therefore conclude that the court erred in determining that it was safe for the children to remain in Aunt's care because she did not intend to starve them.

In addition, we conclude that the court abused its discretion in finding that additional services would mitigate the risk of harm to the children. Immediately *after* the children were diagnosed with nonorganic failure to thrive, the record shows that Aunt thwarted Dr. Young's instructions to their caregiver not to limit the children's food portions. P.G. started to lose the weight that she had gained in the hospital. Six months after the children were diagnosed with nonorganic failure to thrive, Aunt still insisted that the younger children were obese at their current weights. Aunt's concerns about the children's weight caused her to impede the children's relationships with their maternal relatives and ultimately, to end their visits. In denying the request to remove the children from Aunt's care, the court ordered the Department to provide services to the children and Aunt, including monthly visits by the social worker, monthly pediatric checkups for the children, and therapeutic services for Aunt. Although we are not persuaded by the

22

Minors' argument that these services are reunification services that are available only to a parent,[8] the record shows that those or similar services were in place for most, if not all, of the time that the children were in Aunt's care, and that they were ineffective in preventing serious physical harm to the younger children. A suitable caregiver does not require therapeutic intervention to become willing to accept medical advice and to provide adequate food to a child in his or her care. Similarly, an otherwise healthy dependent child should not have to endure monthly pediatric checkups to ensure that he or she is receiving adequate food in what should be a safe, stable, nurturing, and protective placement.

Not all reasons for juvenile court intervention are equal from the point of view of a child's interests. (Cf. *Kimberly F.*, *supra*, 56 Cal.App.4th at p. 530.) Adequate nutrition and food security is an essential need for any person, particularly a young child whose proper growth and development depends on such sustenance, and in turn, on the caregiver to provide it. Here, the uncontroverted evidence shows that Aunt failed to provide the younger children with a fundamental necessity of life—adequate food, and that she failed to appreciate the impact of her actions on their health. Further, there was no indication that Aunt was able or willing to alter her behavior in this regard. The impact of malnutrition on the children's growth and development, and well-being,

---

[8]    Federal law authorizes the provision of family preservation services to adoptive and extended families at risk or in crisis for the purposes of promoting the safety and well-being of children and families, and to increase the strength and stability of families, including adoptive, foster, and extended families. (42 U.S.C. § 629a(a)(1)-(2).) In order to receive federal funding, states must meet federal requirements for provision of services to at-risk families and children. (*Id*., §§ 621, 622.)

outweighs any other benefits that the younger children received in Aunt's care. The record clearly establishes that all four children remain at risk of food insecurity in Aunt's care. We conclude that the court abused its discretion in determining that continued placement in Aunt's care was in the children's best interests.

DISPOSITION

The findings and orders of the juvenile court are reversed.

AARON, J.

WE CONCUR:

McCONNELL, P. J.

BENKE, J.