Filed 12/22/20  Josephine G. v. Charles G. CA1/2
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| JOSEPHINE G.,<br>        Plaintiff and Appellant,<br><br>v.<br><br>CHARLES G.,<br>        Defendant and Respondent. | A157560<br><br>(San Mateo County Super.<br> Ct. No. 16FAM01653) |

Josephine G. appeals from the court's statement of decision, issued after a bench trial, in which the court ordered that Josephine and her former husband, Charles G., are to have joint custody of, and equal time with, their son, who was 11 years old at the time of trial.  Josephine contends that the trial court abused its discretion on several legal grounds.  We conclude her arguments amount to little more than a request that we reweigh the evidence and the credibility of the parties' dueling expert witnesses, neither of which is appropriate under our abuse of discretion standard of review.  We affirm.

**BACKGROUND**

Josephine and Charles were married in October 2001 and their son was born in 2007.  The couple separated in December 2013 and Charles moved out of the family home.  He filed a petition for dissolution of their marriage in November 2016.  Pending the outcome of the case, they shared custody of their child, with Josephine caring for him 60 percent of the time and Charles

1

caring for him 40 percent of the time. Upon the court's dissolution of the marriage, it ordered this arrangement to remain in place until a custody evaluation was completed. Josephine sought this evaluation because she had significant concerns about Charles's ability to parent, including based on journal entries he had written some years before that she had found in her home and read after he moved out.

The court ordered the parties to consider four child custody evaluators. They agreed on Dr. Robin Press, whom the court appointed to conduct the evaluation in April 2017. Dr. Press was instructed to conduct "psychological testing of the parents and the minor child, and make recommendations as to custody, a parenting plan, a holiday schedule, and referrals to support services for the parents as deemed appropriate, according to the best interests of the parties' minor child, including but not limited to consideration of the factors set forth in Family Code Section 3011, whether visitation should be limited pursuant to Family Code Section 3027.5[, subdivision] (b) and whether either parent is engaging in restrictive gatekeeping."

## I.

### *Charles's Writings*

Josephine highlights numerous journal entries and writings by Charles from 2011 to 2016, with most of them written by him between 2011 and 2013, that concern her and indicate that Charles had been emotionally abusive to her and their son. These entries were admitted below as confidential documents and discussed at trial, the record of which is contained in reporter's transcripts that have been filed under seal with this court; Josephine has discussed them in appellate briefs also filed under seal with this court. We have reviewed these entries and writings, and Josephine's

2

contentions regarding them, but will refrain from discussing them or the record contained in the reporter's transcripts in detail here because of their confidential nature.

## II.

### *Dr. Press's Comprehensive Child Custody Evaluation Report*

Dr. Press issued a 40-page comprehensive child custody evaluation report dated October 30, 2017. She described the child as "an adorable, bright, articulate, well-mannered child" who was "consistently alert, attentive and well-oriented," "appeared somewhat shy and seemed hesitant about communicating his feelings, perceptions and preferences" and "seemed eager to please and reluctant to offend." The child reported feeling safe with both parents, and denied any experiences of neglect, physical abuse, verbal abuse, sexual molestation or exposure to domestic violence. According to Dr. Press, his psychological test results indicated he had "numerous adaptive strengths that enable him to function competently and predictably. However, he is distressed because he loves both parents and is in an impossible loyalty bind. [His] mild to moderate anxiety and underlying depression is likely to be situational and transitory. . . . [He] is clearly bearing the brunt of his parents' custody conflicts, but he is too nice, too sensitive, too conflict avoidant and too protective of them, especially his mother, to be more direct about his feelings, needs and preferences."

Press summarized numerous concerns and allegations that Josephine expressed about Charles and his parenting that were based on Josephine's own observations and Charles's writings. Josephine "expressed concerns that during the marriage [Charles] demonstrated disturbing patterns of thinking, behaving and relating to others which she fears may pose a risk to [the child]," including that he engaged in what Josephine considered to be

domestic abuse of an emotional nature. Dr. Press further reported that Josephine said Charles's "private journal entries" were very validating to her because they confirmed what she suspected, and that he was aware of what he was doing although he had denied it up until 2013. Josephine "explained that she was only willing to violate her own integrity about reading [Charles's] private journal when it was about [their son]."

Each of the parents and the child were given a battery of psychological tests.[1] Dr. Press reported that Josephine's tests showed she had "numerous resources that enable her to function in a highly competent manner," was "bright, articulate, resilient, well-organized, cheerful, collaborative and empathic," but could be "morally rigid, judgmental and unforgiving, maintaining unrealistically high standards for others while avoiding acknowledgement of her contribution to problems." Dr. Press added, "[Josephine's] ability to understand people accurately and think logically can be compromised by her preoccupations with past grievances. These findings, coupled with her high anxiety, create a potential for restrictive gatekeeping and difficulties in co-parenting."

According to Dr. Press, Charles's test results showed he was "resilient, competent and productive in managing everyday tasks and extraordinary challenges. He can be quirky in his ideas and perspective on the world as is the case with many creative people. Despite his remarkable accomplishments, [Charles's] mixed feelings about himself generates a self-defeating behavior pattern that enjoins others to devalue him as he toggles

---

[1] Dr. Press administered the Beck Depression Inventory-2 (BDI-2); the Beck Anxiety Inventory (BAI); the Minnesota Multiphasic Personality Inventory -2 (MMPl-2); the Millon Clinical Multiaxial Inventory-III (MCMI-lll); and the Rorschach Inkblot Test and the Social Responsiveness Scale Second Edition (SRS-2).

4

between needs for approval and fears of criticism. The test findings are generally within normal limits. There is no evidence to suggest that [Charles] is unable to function as a competent parent or co-parent."

Dr. Press also included summaries of information she received from seven other psychologists and therapists who had worked with Josephine, Charles and/or the child. None of those who had worked with the parents expressed any concern about each of their ability to parent the child effectively, and none of those who had worked with Charles had any safety concerns about him.

In her summary and assessment, Dr. Press wrote that Josephine and Charles "share a fundamentally similar perception of their child's personality, aptitudes, interests and activities," had a "consistent view of [his] strengths and weaknesses with only minor differences" and "maintained similar expectations, behavioral guidelines and disciplinary approaches." Among other things, they had "demonstrated competence in co-parenting" and were both "nurturing, devoted, conscientious, responsible and capable," which had allowed their child to establish "a solid sense of self-esteem and lovability from which to weather challenges."

Dr. Press further reported that "[r]esearch trends in child custody matters indicate that parents' consistent, predictable, frequent, affectionate and sensitive behavior towards their child is key to forming and maintaining meaningful, secure and healthy parent-child relationships after separation and divorce," and that "evening and overnight visitation periods boost close, meaningful parent-child relationships by providing opportunities for important social interactions and nurturing opportunities that shorter visits cannot provide." Dr. Press opined that "[Josephine's] motivation for protective gatekeeping appears to be rooted in genuine concerns about

5

safeguarding [her child] from harm. However, there is no evidence from any source to indicate that [the child] is at risk of harm in his father's care. Thus, her gatekeeping efforts appear more restrictive than facilitative. [Josephine] clings to a negative perception of [Charles] as manipulative, sadistic and remorseless." Further, "[Josephine's] negative opinion of [Charles] strongly influences her perception of [Charles's] behaviors towards [the child] in ways that are not entirely accurate."

Dr. Press was concerned that Josephine "may be indirectly exposing [the child] to her negative attitudes about [Charles] even though she may not explicitly criticize or devalue [Charles] in front of [the child]." Josephine had agreed to reconsider her point of view in the course of Dr. Press's evaluation if no evidence supported her concerns, but "[o]ver time, [Josephine] became even more intent on presenting 'damning evidence' about [Charles] as she learned there was no data to support her concerns about [his] parenting."

Dr. Press did not find "intimate partner violence" or "child abuse or neglect" in the case. Further, there was no evidence "to suggest that either parent is unable to function as a competent parent or co-parent due to mental health problems." She concluded that "both parents appear competent to parent. . . . [The child] needs to maintain a relationship with both parents in order to feel comfortable and to function optimally. . . . A structured schedule in which his time with each parent is relatively uninterrupted will enable him to build separate, meaningful relationships with each parent and to build his autonomy for coping with the world at large. Minor increases in [the child's] time with his father will allow for longer, uninterrupted time together so that they can continue to develop a close, meaningful relationship. This minor adjustment in timeshare is determined to be beneficial to [the child] and, once established, will become part of the

6

structured schedule.  It is in [the child's] best interests to have balanced access to each parent."

**III.**

***Evidence Presented at Trial***

At trial, the parties' evidence focused on Charles's writings, testimony from expert witnesses and their own testimony.  Charles sought joint custody and equal time with their son, which Josephine opposed.  She requested sole legal custody and asked that additional limits be placed on Charles' time with their son.

**A.  Dr. Press's Testimony About Her Evaluation**

Dr. Press' comprehensive custody evaluation report was admitted into evidence.  Dr. Press testified that she had reviewed Charles's journal entries as copied by Josephine (which both parties confirmed Josephine had obtained without Charles's permission) in the course of preparing her report.  Dr. Press said she discussed with Josephine her concerns about these entries and considered them when making her recommendations.  Dr. Press also said that when she was for all intents and purposes finished with her evaluation, she accommodated Josephine's request for additional meetings so that Josephine could fully express her concerns about Charles, but that Josephine did not present anything new or different during these meetings.

Dr. Press confirmed that she did not find any evidence of intimate partner violence in the case, or that Charles had behaved inappropriately with his son, engaged in behavior with other children that posed a risk to his son, or would not properly oversee their son's interactions with his paternal grandmother (one of Josephine's concerns).  Dr. Press also confirmed that she found no evidence from any source to indicate that the child was at risk of harm in Charles's care, and that she thought it was in the child's best

7

interest to have increased time with Charles and balanced access to each parent.

## B. Dr. McCall's Testimony About Dr. Press's Evaluation

Josephine presented the expert testimony of Dr. Shawn McCall, who testified about a report he prepared critiquing Dr. Press's evaluation report and about his conclusions. He testified that Dr. Press's evaluation had "so many glaring holes and problems" that it was "not usable." Among other things, Dr. McCall testified that:

- A "responsible evaluator would look at" Charles's journal entries and "be pretty alarmed" by some of his imaginings.

- Charles's admissions in his writings regarding his treatment of Josephine and his son were "real, objective data points" about his inner experience that "bypass all the psychological testing" and "give you the real deal as to what's going on in someone's mind."

- Dr. Press did not apply the Association of Family and Conciliation Courts' Guidelines for the evaluation of intimate partner violence, which, Dr. McCall testified, "specifically enumerate there needs to be a section of analysis dedicated . . . just to that topic" rather than an analysis that was "just smattered throughout the whole report."

- After Josephine told Dr. Press that therapists had validated Josephine's view that Charles had emotionally abused her, Dr. Press did not re-contact those therapists to inquire about it as "a responsible evaluator" would have done, instead relying on her "vague and nebulous" inquiries about whether "everything" was okay.

- Dr. McCall thought there was no data to support Dr. Press's conclusion that Josephine engaged in inappropriate "restrictive gatekeeping" of her son.

8

- Charles's acknowledgement of certain matters in his journal entries should have caused a competent evaluator to ask follow-up questions to Charles, but Dr. Press did not do so.

- Dr. Press "just glossed over" Josephine's "report in the file that she witnessed" Charles "roughhousing" with their son in a way that seemed inappropriate to her.

- Although there was concerning evidence of certain behaviors that Charles experienced as a child that could impact his parenting, Dr. Press did not address that issue thoroughly in her evaluation.

- Dr. Press did not engage in procedures that shielded her from forming a bias, instead meeting first with just Charles rather than both parents to discuss her findings with him; she also reached conclusions while Josephine was still trying to get information to her, indicating Dr. Press "had already made her decision."

Dr. McCall acknowledged that he did not interview the parties, the child, or the other sources of information contacted by Dr. Press.

## C. Dr. Press's Testimony About Dr. McCall's Critique

Dr. Press testified that she had reviewed Dr. McCall's report. She disagreed with Dr. McCall's charge she was biased against Josephine. She had reviewed all the documents both parents had submitted to her, including Charles's journal entries. She did not give these entries as much weight as Josephine wanted because they were "private journals that were not intended to see the light of day in a public arena. What someone writes in a private journal may have nothing to do with how they behave in the real world, but I believe each person is entitled to their own fantasies or thoughts or feelings that they write in private. That's why it's private." Also, they were "a little older, so more stale, one could argue less relevant."

9

Dr. Press also testified she was familiar with intimate partner violence and "[i]n a way" her entire report addressed this issue, so there was no need for a redundant separate analysis. She indicated that she was familiar with and had followed both state and national guidelines for child custody evaluations. Further, she said, she had training and many years of experience administering and interpreting psychological tests and had been hired hundreds of times by other mental health professionals to conduct testing for them. She said she would not make any changes to her report based on Dr. McCall's critique, and indicated that this case was "an easy call."

## D. Other Relevant Evidence

Charles testified to his extensive involvement with his son from birth. He denied engaging in domestic abuse. He testified that to the extent he had used terms that referred to "abuse" and the like in his journal entries, he had done so because Josephine had used such terms in the course of their relationship. He had come "to agree with those, in part out of appeasement of her, and so I accepted those labels, but upon reflection later, I recognized that they didn't fit with me." He was critical of the court's temporary 60/40 custody schedule because neither he nor Josephine had a full weekend with their son. He was requesting a "2-2-5-5" schedule in order to provide their son with a more robust and complete life with both parents.

Josephine testified about her concerns regarding Charles and the troubling behaviors he had engaged in, which testimony was consistent with what Dr. Press reported she had told her. She also testified that she had felt Dr. Press had been dismissive of her concerns about Charles. Josephine acknowledged in her testimony that Charles had never hit her, physically attacked her, made harassing telephone calls, stalked her, or hacked,

10

accessed or disclosed her e-mails or writings. He had complied with her limits on delivering Christmas gifts to their son and her bar against taking their son to a family reunion in Boston, although his son had not seen his paternal grandparents for four years.

## IV.

### *The Trial Court's Statement of Decision*

In its statement of decision, the court noted that it was not required to respond to the many evidentiary questions submitted by Josephine in her request for a statement of decision. It indicated it would focus on a discussion of ultimate rather than evidentiary facts.

The court declined Josephine's request to discredit Dr. Press's evaluation on the grounds that Dr. Press showed a bias in favor of Charles and prepared a report with fatal flaws that rendered it unusable. The court found Dr. Press to be "a neutral and credible" witness and her evaluation to be persuasive. It noted that the mental health professionals contacted by Dr. Press affirmed her conclusion that Charles was a competent and safe parent, and that none of them expressed any concerns about his ability to safely and appropriately parent his son. It found that "Dr. Press was able to maintain her objectivity and gather balanced information for both parties and from the child," and that "[t]here was nothing presented to the court that would provide a basis for determining that . . . Dr. Press was biased against [Josephine]." It further found Dr. Press's "methodology to be more than adequate, and any deficiencies did not rise to the level where the court found reason to discredit her recommendations and conclusions. Dr. Press presented as a calm and effective expert that answered questions directly and did not become an advocate for either party." It was "satisfied that Dr. Press gathered and synthesized appropriate clinical data to support her

11

determination that [Charles] is a safe and competent parent, that an increase in [Charles]'s time-share will be beneficial to the minor child, and it is in the child's best interests to have balanced access to each parent."

The court agreed with Dr. Press's determination that there were no findings of intimate partner violence or child abuse or neglect in the case. It found that Charles's private writings did not support a finding that Charles had perpetrated domestic violence in the previous five years and, therefore, there was no need to apply Family Code section 3044's presumption against awarding sole or joint custody to Charles.[2] The court explained, "It is not clear whether that finding may have been appropriate at some point in the past, however based on what was submitted to this court at trial there was not sufficient evidence to make a finding that domestic violence was committed in this case and specifically at a point after September of 2013. The abuse alleged by [Josephine] was disputed by [Charles] and there was not sufficient corroborating evidence of abuse that would rise to the level of the court making a finding that [Charles] had 'perpetrated domestic violence' so as to trigger a Family Code 3044 presumption." The court also rejected any contention that Charles left his journals in the family residence for Josephine to find, or to intimidate or harass her.

_____

[2] Family Code section 3044 states in relevant part, "Upon a finding by the court that a party seeking custody of a child has perpetrated domestic violence within the previous five years against the other party seeking custody of the child, or against the child or the child's siblings, or against any person in subparagraph (C) of paragraph (1) of subdivision (b) of [Family Code] Section 3011 with whom the party has a relationship, there is a rebuttable presumption that an award of sole or joint physical or legal custody of a child to a person who has perpetrated domestic violence is detrimental to the best interest of the child, pursuant to Sections 3011 and 3020. This presumption may only be rebutted by a preponderance of the evidence." (Fam. Code, § 3044, subd. (a).)

12

The court stated that it had considered Dr. McCall's report and testimony. It "found it difficult to accept Dr. McCall's opinions without the shade of him being an advocate" and cited the following examples: "a) on multiple occasions Dr. McCall stepped out of his role as an expert and instead advocated for [Josephine]; b) Dr. McCall made arguments to the Court instead of simply giving objective expert opinions; c) in contravention of his expert role, Dr. McCall would not identify any strengths in Dr. Press' report and instead stated to the Court there was nothing at all to be gained from Dr. Press' report."

The court concluded that, based on its assessment of the evidence and in careful consideration of the health, safety and welfare of the child, it was in the child's best interests to have a continuous and close relationship with both parents. It found that, "[f]or this purpose, the Court has no concerns about [Charles's] parenting of the minor. [Charles] has shown to the satisfaction of the Court that he behaves appropriately and in a manner that the Court would expect of any parent with the minor. Given the Court's finding that both parents have demonstrated over the past few years competence in providing the minor child with stability, predictability, and consistency for optimal security and growth, it is the obligation of this Court to ensure the minor child has frequent and continuing contact with both parents and to encourage the parents to share the rights and responsibilities of parenting." The court ordered that the parents would have joint custody of their child and share equal time with him.

Josephine filed a timely notice of appeal.

## DISCUSSION

Josephine argues on multiple grounds that the trial court's order that she and Charles have joint custody over, and share equal time with, their

child has no reasonable basis and, therefore, constitutes an abuse of discretion.  None of her arguments are persuasive.

## I.

### *Relevant Legal Standards*

"We review custody orders . . . for an abuse of discretion, and apply the substantial evidence standard to the court's factual findings.  [Citation.]  A court abuses its discretion in making a child custody order if there is no reasonable basis on which it could conclude that its decision advanced the best interests of the child" or if the court "applies improper criteria or makes incorrect legal assumptions."  (*In re Marriage of Fajota* (2014) 230 Cal.App.4th 1487, 1497, italics omitted; see also *Ellis v. Lyons* (2016) 2 Cal.App.5th 404, 418 [custody order "infected by legal error" was abuse of discretion].)  The court also abuses its discretion if it does not engage in reasoned judgment, fails to base its decision on all the evidence before it and does not maintain impartiality.  (*In re Marriage of Schwartz* (1980) 104 Cal.App.3d 92, 95 [reversing ruling that "harbored and exhibited an unshakable prejudice against" a court-approved custody arrangement].)

The "trial courts have broad powers and have the widest discretion to fashion a custody and visitation plan that is in the child's best interest . . . ."  (*Heidi S. v. David H.* (2016) 1 Cal.App.5th 1150, 1162.)  We do not reverse "unless a trial court's determination is arbitrary, capricious, or patently absurd."  (*Ibid*.)  Also, we are mindful that " ' "[t]he trial judge, having heard the evidence, observed the witnesses, their demeanor, attitude, candor or lack of candor, is best qualified to pass upon and determine the factual issues presented by their testimony.  This is especially true where the custody of minor children is involved." ' "  (*Catherine D. v. Dennis B.* (1990) 220 Cal.App.3d 922, 931.)  "As the exclusive judge of the credit and weight to

14

be given to the testimony of a witness, the trier of fact may reject the testimony of a witness even if . . . it is uncontradicted." (*Jennifer K. v. Shane K.* (2020) 47 Cal.App.5th 558, 579.) " '[I]n a bench trial, the trial court is the "sole judge" of witness credibility. [Citation.] The trial judge may believe or disbelieve uncontradicted witnesses if there is any rational ground for doing so. [Citation.] The fact finder's determination of the veracity of a witness is final. [Citation.] Credibility determinations thus are subject to extremely deferential review.' " (*Ibid.*)

## II.

### *The Court Did Not Misapply the Burden of Proof.*

Josephine first argues that the trial court abused its discretion by saddling her with the burden of proof, even though Charles was the petitioner. She points to the court's decision to allow her to begin closing argument and present a rebuttal and the court's statement, made in the course of considering whether to consider Charles's confidential journal entries that Dr. Press reviewed as part of her evaluation, that "looking at all the burdens here, really in some ways obviously the burden is more on [Josephine] to show to the Court why the Court shouldn't follow this expert recommendation." Josephine is incorrect.

Josephine argues that Charles had the burden as the petitioner seeking a change in circumstances, as in *In re Marriage of Schwartz, supra,* 104 Cal.App.3d at page 96. It is true that this dispute was initiated when Charles petitioned for a permanent custody order in which the parties shared custody and equal time regarding their child, a change in the previous 60-40 division favoring Josephine that was a part of the court's *temporary* custody order. However, Charles's petition presented the court with a request that it issue a *permanent* custody order for the first time. In that circumstance, we

15

are not persuaded that either party had the burden of proof.  Rather, "[t]he trial court is always bound to make a custody decision based upon the child's best interest.  But depending upon the posture of the case, the trial court will use either the 'best interest' analysis or the 'changed circumstances' analysis.  The best interest analysis is used when making a permanent custody determination initially.  'In an initial custody determination, the trial court has "the widest discretion to choose a parenting plan that is in the best interest of the child." (Fam. Code, § 3040, subd. (b).)  It must look to *all the circumstances* bearing on the best interest of the minor child.' [Citation.] [¶] The changed circumstances test requires a threshold showing of detriment before a court may modify an existing final custody order that was previously based upon the child's best interest." (*Ragghanti v. Reyes* (2004) 123 Cal.App.4th 989, 996.)

But even assuming for the sake of argument that Charles had the burden of proving that his proposed shared custody arrangement was in the child's best interest, the trial court did not mistakenly assign this burden to Josephine.  The court's comment that Josephine had the burden of showing the court it should not follow Dr. Press's recommendation, read in context, was simply the court's way of saying it found Dr. Press's evaluation and recommendations persuasive.  That the court allowed Josephine to argue first in closing argument and present a rebuttal did not establish that the court had assigned her the burden of proving that custody should not be equally shared.  Again, it indicated only that the court found Dr. Press credible and convincing and thus gave Josephine the opportunity to persuade the court it should not follow her recommendation.  The court's statement of decision specifically referred to its obligation to review the totality of the circumstances and make a decision that was in the child's best interest, and

it did not refer to any burden of proof held by Josephine, or assign any such burden to her.  In short, Josephine's argument is without merit.

## III.

### *The Trial Court Did Not Abuse Its Discretion by "Rubberstamping" Dr. Press's Report or Ignoring Josephine's Allegations and Concerns.*

Next, Josephine argues that the trial court "abrogated" its duty to consider Charles's purported history of domestic abuse of an emotional nature against her, including by relying on Dr. Press's report, which supposedly considered spousal abuse to be irrelevant to a custody determination and failed to analyze Charles's abuse and other inappropriate behavior.  Again, Josephine is incorrect.  Her arguments ignore Dr. Press's and the court's consideration of the issues she raises, and amount to a request that we reweigh the evidence regarding the reports and testimony of the dueling experts in this case, Dr. Press and Dr. McCall.

According to Josephine, Dr. Press relied on the "incorrect legal theory" that domestic abuse was not relevant to a custody evaluation based on her agreement to a proposition framed by Josephine's counsel during cross examination that "a parent in a marriage is not the same thing as a parent in a parent role."  Dr. Press's response to the question reflected her view that the dynamic that had occurred during Josephine and Charles's marriage was not *as* relevant as what was happening in their parenting in the present, rather than a statement that spousal abuse is categorically irrelevant to child custody.  Neither this, nor other purported failings that Josephine refers to (such as Dr. Press's failure to ask Charles about specific journal entries), negate the unmistakable, clear indications in the record that we have discussed in the background section.  Josephine ignores that Dr. Press considered all of Josephine's allegations and concerns, including those based on Charles's journal entries, gave Josephine the opportunity to provide as

17

much information as she could regarding her concerns, spoke to other mental health professionals who had worked with Charles to determine if they had any concerns about his parenting, and reached her conclusions about Charles's parenting only after doing all of the above.

Further, Josephine relies heavily on Dr. McCall's view of the fatal flaws in Dr. Press's report and that Dr. Press was incompetent. In doing so, Josephine fails to grapple with the fact that the court was entitled to and did the reject Dr. McCall's testimony for lack of credibility based on his apparent advocacy and lack of neutrality. Josephine's comment that the court's rejection was "baseless" because Dr. McCall's critiques were, in her view, accurate is misguided in that it fails to recognize the limits on our role as an appellate court.

" '[A]lthough we must ensure that evidence is reasonable, credible, and of solid value, nonetheless it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts on which the determination depends. [Citation.] Thus, if the verdict is supported by substantial evidence, we must accord due deference to the trier of fact and not substitute our own evaluation of a witness's credibility for that of the fact finder.' [Citation.] This is true even in the context of expert testimony." (*People v. Poulsom* (2013) 213 Cal.App.4th 501, 518; accord, *People v. Mercer* (1999) 70 Cal.App.4th 463, 466-467 [appellate court was not free to reweigh or reinterpret expert credibility and conclusions resolved against defendant by the jury].)

Here, the trial court was within its discretion to discredit Dr. McCall's complete rejection of Dr. Press's conclusions in their entirety and of her competency, and to agree with Dr. Press that the case did not involve intimate partner domestic violence. This is particularly the case in light of

18

Josephine's heavy reliance on Charles's confidential reflections about his own behavior in his journal entries rather than on corroborated examples of his conduct that could have qualified as "domestic violence"[3] and triggered the Family Code section 3044 presumption against custody.[4]  Josephine also overlooks her own acknowledgment during her testimony that Charles had never hit her, physically attacked her, made harassing telephone calls, stalked her, or hacked, accessed or disclosed her e-mails or writings.  We will not second-guess the trial court's conclusions that Dr. Press was a neutral and credible witness and that Dr. McCall was not.

In short, the court did not abrogate its duty, but instead acted within its discretion in considering Dr. Press's and Dr. McCall's credibility and conclusions.  It did not ignore Josephine's allegations and concerns regarding Charles's purported history of domestic abuse, and it is not within our role as appellate judges to reweigh or second-guess the trial court's determination of the credibility of the expert witnesses.

---

[3]  Notably, there is no evidence in the record that during or after their marriage Josephine ever sought a domestic violence restraining order against Charles, sought to bar, or to have supervised, his visits with their son after Charles left the home or under the court's temporary order, or made any reports to the police or child protective services about Charles's behavior.

[4]  Family Code section 3044, subdivision (c) provides, "For purposes of this section, a person has 'perpetrated domestic violence' when the person is found by the court to have intentionally or recklessly caused or attempted to cause bodily injury, or sexual assault, or to have placed a person in reasonable apprehension of imminent serious bodily injury to that person or to another, or to have engaged in behavior involving, but not limited to, threatening, striking, harassing, destroying personal property, or disturbing the peace of another, for which a court may issue an ex parte order pursuant to Section 6320 to protect the other party seeking custody of the child or to protect the child and the child's siblings."

## IV.

### *The Court Did Not Make Incorrect Legal Assumptions.*

Finally, Josephine argues that the trial court abused its discretion by making an incorrect legal assumption, in that the court ignored that the public policy in favor of a child having frequent and continuing contact with both parents is subordinate to the health, safety and welfare of the child, as mandated by Family Code section 3020.[5]  This argument is also premised on Josephine's contention that the trial court should have found that Charles had engaged in domestic violence of an emotional nature but failed to do so. Again, substantial evidence supports the trial court's findings.

### DISPOSITION

The judgment is affirmed.

---

[5]  Family Code section 3020 provides in relevant part:

"(a) The Legislature finds and declares that it is the public policy of this state to ensure that the health, safety, and welfare of children shall be the court's primary concern in determining the best interests of children when making any orders regarding the physical or legal custody or visitation of children.  The Legislature further finds and declares that children have the right to be safe and free from abuse, and that the perpetration of child abuse or domestic violence in a household where a child resides is detrimental to the health, safety, and welfare of the child.

"(b) The Legislature finds and declares that it is the public policy of this state to ensure that children have frequent and continuing contact with both parents after the parents have separated or dissolved their marriage, or ended their relationship, and to encourage parents to share the rights and responsibilities of child rearing in order to effect this policy, except when the contact would not be in the best interests of the child, as provided in subdivisions (a) and (c) of this section and Section 3011.

"(c) When the policies set forth in subdivisions (a) and (b) of this section are in conflict, a court's order regarding physical or legal custody or visitation shall be made in a manner that ensures the health, safety, and welfare of the child and the safety of all family members."

20

_____

STEWART, J.


We concur.


_____

KLINE, P.J.


_____

MILLER, J.


*Josephine G. v. Charles G.* (A157560)