Filed 6/20/23  S.H. v. P.H. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| S.H.,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>P.H.,<br><br>    Defendant and Respondent. | D079715<br><br><br>(Super. Ct. Nos. 19FL008619N<br>& 19FDV02673N) |


APPEAL from an order of the Superior Court of San Diego County, James A. Mangione, Judge.  Affirmed.

Law Offices of Beatrice L. Snider, John L. Romaker and Alexandria M. Jones for Plaintiff and Appellant.

No appearance for Defendant and Respondent.


S.H. appeals the order denying her request for a three-year domestic violence restraining order (DVRO) against her husband, P.H.  S.H. claims the trial court erred by failing to give preclusive effect to a protective order issued in a criminal case against P.H. and by considering improper criteria and misinterpreting the Domestic Violence Prevention Act (DVPA; Fam. Code,

§ 6200 et seq.) to conclude she did not meet her burden to prove he committed abuse that would justify issuance of the requested DVRO.  We affirm.

## I.

## BACKGROUND

### A.  *Parties' Brief Marriage*

S.H. married P.H. in March 2017, and a son was born to them later that year.  P.H. has a daughter (born in 2012) from a prior relationship who lived with S.H. and P.H.  S.H. moved out of the marital residence in March 2019 and took her son with her.  She returned to the residence in May and June of that year to retrieve belongings and to help care for P.H.'s daughter, but not to live there.

### B.  *DVRO Pleadings*

On June 21, 2019, S.H. filed a request for a DVRO on behalf of herself and her son.  In a supporting declaration, S.H. stated P.H. is a member of the Hells Angels Motorcycle Club and has had "a violent demeanor" for as long as she has known him.  S.H. stated that before she started dating P.H., he had been convicted of two federal crimes.  S.H. stated that during their relationship P.H. beat a 17-year-old neighbor with a baseball bat, beat a woman at a party and dragged her outside by her hair in the presence of their son, and beat another Hells Angels member so badly that P.H. broke his own hand.  Although S.H. realized P.H. was a violent person, she did not think he would direct his violence at her or their son.  She allegedly learned otherwise after finding steroids and syringes in a medicine cabinet.  P.H. screamed at S.H. and called her a " 'bitch who's here to pick up his dirty underwear, suck his d\*\*k and raise his kids' "; " 'a dumb hooker with daddy issues' "; " 'a scumbag ni\*\*er who doesn't do shit and isn't go[od] for anything' "; and a " 'c\*\*t.' "  According to S.H., P.H. threatened to harm or kill

2

her if she left him; he said he would "hunt [her] down," take their son away so that she could never find him, and "liquefy [her] body" so that it would never be found. S.H. stated that during the incident that caused her to move out in March 2019, P.H. shouted obscenities and racial slurs at S.H.; threatened to " 'punch [her] in [her] c**k-sucker' " (i.e., her mouth); "tried to flip the mattress [their] son . . . was lying on"; and "screamed and cursed at [her] until both children were terrified and sobbing." When S.H. visited the marital residence in May and June 2019, P.H. verbally abused her, shoved her out the back door, and threw some of her belongings at her. S.H. stated she feared P.H. would carry out his threats to injure or kill her and to take away their son. She requested personal conduct and stay-away orders, as well as orders that she be given sole legal and physical custody of her son and P.H. be given no visitation. (See Fam. Code, §§ 6320, subd. (a), 6323, subd. (a)(1).)

The trial court granted a temporary DVRO that included personal conduct and stay-away orders, granted S.H. sole legal and physical custody of her son, and granted P.H. no visitation. The court set a hearing on the request for a permanent DVRO.

In his response to the DVRO request, P.H. did not agree to the orders S.H. had sought and requested joint legal custody of their son and unsupervised visitation. P.H. denied S.H.'s allegations and stated he could not then fully respond to them because of "concerns arising out of the 5th Amendment to the United States Constitution."

C. *Marital Dissolution Proceeding*

On July 17, 2019, S.H. filed a petition for dissolution of her marriage to P.H., in which she requested sole legal and physical custody of her son. The trial court consolidated the marital dissolution proceeding with the DVRO

3

proceeding on August 12, 2019. While the DVRO proceeding was pending, the court held hearings and made orders regarding custody, visitation, and support of the parties' son.

D.    *DVRO Hearing*

The trial court held an evidentiary hearing on S.H.'s DVRO request over portions of several days, including July 5 and August 12, 2019; February 27, 2020; and April 7-9 and 16, 2021. The court continued the temporary DVRO in effect during the course of the hearing.

1.    *S.H.'s Testimony*

S.H. testified consistently with the statements in the declaration she submitted in support of the DVRO request. S.H. said P.H. was the sergeant at arms of his motorcycle gang and in that role enforced, by physical force if necessary, the rules of the gang against noncompliant members. S.H. testified that before she left P.H. for the final time in March 2019, she had left him twice before but decided to go back to him. Between the time S.H. moved out in March 2019 and the time she sought the DVRO, she communicated regularly with P.H., and in those communications he called her "ni**er," "c**t," "b**ch," and used other vile language. S.H. became concerned for her safety when P.H. asked their son, who was then two-and-a-half years old, where he was during a video conference.

On cross-examination, S.H. stated she regularly directed profanities at P.H. in their conversations and had made threats of physical violence against her employer. She said that after their son was born, she talked to P.H. about having more children, purchasing a house together, and sending him back to school so that he could get a better job. S.H. testified that when she learned the mother of P.H.'s daughter had been telling others how abused and frightened S.H. was in the marriage, she sent P.H. a text message

4

stating: "Do you honestly believe that if I was at all concerned I would go to [the mother of P.H.'s daughter] of all people? I'm getting really tired of her game playing with me." S.H. admitted the rumors she was trapped in a violent relationship were false. S.H. testified that after she had moved out of the marital residence, she exchanged text messages with P.H. in which she wrote she would "love to be home with [him]" and others in which they discussed sex acts they wanted to do with each other. S.H. admitted she did not see P.H. beat a 17-year-old neighbor with a baseball bat. She said P.H. sometimes threatened her "in a joking or rhetorical manner" or "in jest," and she could tell whether or not he was serious by his tone of voice, body language, and other remarks. S.H. said she never complained about physical abuse in her text messages to P.H., and they both used foul language when communicating with each other. S.H. admitted that within days of filing the DVRO request, she had solicited sex from P.H. and exchanged sexually explicit videos and photographs with him. She testified she had trained in kickboxing, a form of martial arts, for five to six years and competed against others under the name "Bruiser."

On redirect examination, S.H. stated that after she had obtained the temporary DVRO, a Hells Angels member she did not recognize followed her as she was driving on a freeway, stopped by her vehicle near the end of the freeway, and looked over at her before proceeding on. On another occasion, a Hells Angels member S.H. recognized pulled up next to her at a gas station and then circled the station while she was refueling her car. On a third occasion, a childhood friend of P.H. parked his work truck near S.H.'s attorney's office and, after S.H. left the office, followed her for a few miles. As examples of physical violence, S.H. testified that: (1) P.H. telephoned her one evening to report he had broken his hand in a fight; (2) he told her he had

5

choked the mother of his daughter and slammed her against walls; (3) he told her he hit a prior girlfriend, dragged her out of the house by her hair, and urinated on her; and (4) she saw him beat up a friend for defending a person he considered a "rat."

On recross-examination, S.H. conceded that before she married P.H., she knew he had been in prison and was an active member of Hells Angels. She said neither the Hells Angels member who pulled up next to her at the gas station nor P.H.'s friend who followed her from her attorney's office spoke to her during those encounters.

### 2. *P.H.'s Testimony*

During questioning by S.H.'s counsel, P.H. was asked about multiple text messages and audio recordings and acknowledged he had called S.H. a "scumbag," a "c**t," a "piece of s**t," and said she was "in ni**er mode," but he did not recall the conversations. P.H. admitted that he got into a fistfight at his house with a longtime friend when they had a difference of opinion and that S.H. and their son were present. He also admitted he injured his hand in a fistfight with a member of another motorcycle club whose behavior he did not like. P.H. said S.H. "encourage[d]" him to show people sexually explicit photographs and videos of her. He testified he has been a Hells Angels member for 13 years, held the position of sergeant at arms, and in that position was never "called upon to administer any kind of justice outside of just keeping order in a meeting." P.H. testified that after the temporary DVRO issued, he never instructed any Hells Angels member to follow S.H. and never tried to learn her location because he "want[s] nothing to do with that woman." P.H. never asked his son where he was staying but did ask him where he had gone when he disappeared from the screen during a video visit.

6

On questioning by his counsel, P.H. described the argument he had with S.H. at their house on June 20, 2019. He said S.H. was outside berating his daughter and told her she had a bad attitude when he leaned out the window and told S.H. she was the one with the bad attitude. S.H. became "unglued," "started cussing and screaming," and called P.H. a " 'punk-ass b**ch' " and a " 'piece of s**t.' " P.H. told S.H., "Grab your s**t and get the f**k out." P.H. went outside and threw his son's jacket up in the air in S.H.'s direction; the jacket landed on her head in such a funny way that he started laughing hard. S.H. threw a "halfway" punch at him and kicked him in the leg. P.H. shoved her away and told her not to touch him, and by that point the children were screaming and crying. He denied throwing anything other than the jacket at her, and said he never struck or threatened to strike her and was never violent toward their son.

P.H. denied he beat a 17-year-old neighbor with a baseball bat. He also denied he ever dragged a woman by her hair, punched a female correctional officer in the face, or told S.H. he had done so. P.H. testified he has never been violent with a woman. He admitted he used foul language with S.H., but denied he ever threatened to harm or kill her. P.H. also denied he ever told S.H. he "would make her go away" if she called the police.

P.H. admitted he took testosterone and vitamin B-12 injections while he was married to S.H. He kept the bottles of testosterone and vitamin B-12 and the syringes in the refrigerator or in fishing tackle boxes in the garage, not in the medicine cabinet in the bathroom.

P.H. testified he forwarded a sexually explicit photograph of S.H. to a friend with whom she had had an intimate relationship. He said S.H. knew he previously had shared such photographs and "she didn't care" because "[s]he's not shy" and "was an exhibitionist at times."

### 3. *Other Witnesses' Testimony*

C.C., the woman S.H. accused P.H. of dragging out of a party by her hair, testified at the DVRO hearing. When asked about the incident, C.C. said she was at her boyfriend's house for a party and walked in on P.H. and S.H. as she was breastfeeding their son in a bedroom. P.H. became upset and said something like, "What the hell?" or "What are you doing?" C.C. said there were "loud voices and yelling," but she was not grabbed by the hair or pulled out of the room and "[n]obody was physically violent."

G.S., who lived next door to P.H. and S.H. during their marriage, also testified at the hearing. He overheard an argument on June 20, 2019, during which S.H. called P.H. a "son of a b**ch," a "mother fu**er," and a "piece of s**t," and said she no longer wanted to be there. P.H. responded: "[T]hat's fine. If that's what you want, then go. The door is right there. Get your stuff and leave." G.S. did not hear P.H. threaten S.H., but he did hear her threaten "to call the cops on him and tell them that he had touched her." In response, P.H. told S.H. "to go ahead and do what [she had] to do but just get out." This "was the first and only big fight that [G.S.] heard," and he never saw P.H. strike S.H.

Another witness at the DVRO hearing was S.H.'s mother, S.T. She testified S.H. telephoned her on June 20, 2019, and in the background she could hear P.H. "becoming more agitated" and the children crying. S.T. told S.H. to focus on getting her belongings and her son and leaving. S.T. testified that during S.H.'s marriage to P.H., S.H. telephoned S.T. at least five times and stated she was afraid for the safety of herself and her son. S.T. testified she saw syringes and drug bottles in the kitchen refrigerator but not in the bathroom. She testified P.H. once told her he had punched a female correctional officer in the face and thought it was funny.

4.	*Documents Related to Testimony*

Many documents were introduced during and after the witnesses' testimony, including photographs of the steroids and syringes S.H. found in the medicine cabinet, audio and video recordings, and e-mail and text messages between S.H. and P.H.  The text messages include frequent use of foul language by both parties, sexually explicit images, and complaints from S.H. about P.H.'s communications with other women.

5.	*Documents from Related Criminal Case*

While the DVRO proceeding was pending, criminal charges arising out of the allegations S.H. had made in her DVRO request were filed against P.H.  The criminal case was resolved on January 9, 2020, when P.H. pled guilty to distribution of an image of an intimate body part of S.H. under circumstances in which they had agreed to keep the image private, he knew distribution would cause her serious emotional distress, and she suffered such distress.  (Pen. Code, § 647, subd. (j)(4)(A).)  The sentencing court granted P.H. probation and as a condition of probation issued a domestic violence criminal protective order requiring P.H. not to contact and to stay away from S.H. for three years, except to exchange their son.  (*Id.*, § 1203.097, subd. (a)(2).)  The plea form and criminal protective order were admitted into evidence at the close of the evidentiary hearing.

6.	*Closing Arguments*

S.H.'s counsel argued S.H. qualified for a DVRO because P.H.'s regular use of racial slurs, foul language, threats, and intimidation against a background of criminal activity, drugs, and violence, disturbed S.H.'s peace over an extended period of time, made her fear for her safety, and ultimately led to a final blowup in which P.H. physically attacked her.  Counsel said S.H. "feels she still has a target on her back."  Counsel also argued P.H.'s

distribution of the sexually explicit photograph of S.H. in violation of Penal Code section 647, to which he pled guilty, constituted domestic violence sufficient by itself to warrant issuance of a DVRO. Counsel further argued the distribution violated the temporary DVRO. Counsel urged the trial court to issue a three-year DVRO.

P.H.'s counsel argued S.H. had not met her burden of proof to obtain a DVRO. Counsel stated the record did not establish P.H. violated the temporary DVRO by sharing the sexually explicit photograph of S.H. because there was no evidence he sent it after he had been served with the temporary DVRO. Counsel conceded P.H. has a temper and is "no peach," but contended the court "can't issue a restraining order for being a jerk." Counsel argued there was no evidence to support S.H.'s allegations that P.H. beat a 17-year-old neighbor with a baseball bat, dragged a woman outside by her hair at a party, or tried to flip over the mattress on which S.H. and their son were resting. Counsel further argued S.H. knew P.H. was "rough-hew[n]" and "a bad boy" when she met him, but she married him anyway and repeatedly sought to go back to him after he had kicked her out. Counsel argued S.H.'s actions were inconsistent with those of a battered and abused wife afraid for her life, but consistent with those of a jealous wife desirous to keep their son away from her husband. Counsel asked the trial court to deny the DVRO request.

In rebuttal, S.H.'s counsel argued S.H. is a dedicated mother who tried to salvage her marriage, but after the June 20, 2019 incident she knew she could not do so and decided to leave P.H. for good for the safety of herself and her son. Counsel again urged the court to issue a DVRO to protect S.H. and her son from P.H.

7. *Trial Court's Decision*

The trial court took the matter under submission and announced its decision denying the DVRO request on August 3, 2021. The court largely agreed with P.H.'s counsel's interpretation of the evidence. The court stated S.H. knew P.H. was a "bad boy" when she married him, "liked the fact that he was a tough guy," and was herself "pretty tough too." The court stated S.H.'s repeated attempts to move back in with P.H. after he threw her out and her express desire to buy a house and have another child together were not the words and actions of a woman who was reasonably afraid for herself or her son. The court agreed with P.H.'s counsel that S.H. was "highly jealous of other women in [P.H.'s] life," was "very resentful that he would not have her back," and pursued the DVRO as a "way to avenge what she consider[ed] to be untoward acts by him."

The trial court ruled the incident on June 20, 2019, during which P.H. threw the son's jacket at S.H. and shoved her away, was not domestic violence. The court concluded S.H. had not met her burden of proof that P.H. beat a 17-year-old neighbor with a baseball bat, dragged a woman by her hair, or flipped S.H. or their son off a mattress. In support of this conclusion, the court briefly discussed "three incidents of exaggeration by [S.H.]" during the hearings. The trial court found P.H.'s sending the sexually explicit image of S.H. to a friend was not a violation of the temporary DVRO, because S.H. did not meet her burden of proof that he sent it after he had been served with the temporary DVRO. The court ruled P.H.'s plea of guilty to a violation of Penal Code section 647, subdivision (j)(4)(A) constituted an admission but did not collaterally estop him from contesting the factual basis for the plea in the DVRO proceeding, and found P.H.'s sharing of the sexually explicit image of

11

S.H. did not cause her emotional distress that would support issuance of a permanent DVRO.

In summing up, the court stated S.H. had not met her burden of proof that P.H. "intentionally or recklessly caused or attempted to cause bodily injury" or that she "was in reasonable apprehension of imminent serious bodily injury to her[self] or to [her son]."

The court later filed a written order denying the DVRO request, from which S.H. timely appealed. (Code Civ. Proc., § 904.1, subd. (a)(6) [order refusing to grant injunction is appealable]; *N.T. v. H.T.* (2019) 34 Cal.App.5th 595, 601 (*N.T.*) [order denying DVRO request is appealable].)

## II.

## DISCUSSION

A.    *Standard of Review*

"We review an order granting or denying a DVRO for abuse of discretion. [Citation.] In reviewing the trial court's factual findings, we apply the substantial evidence rule. . . . We accept as true all evidence tending to establish the correctness of the trial court's findings and resolve every conflict in favor of the judgment." (*M.S. v. A.S.* (2022) 76 Cal.App.5th 1139, 1143-1144 (*M.S.*).) Whether the court correctly interpreted the DVPA or applied the correct legal standard presents a legal question subject to de novo review. (*In re Marriage of Ankola* (2019) 36 Cal.App.5th 560, 564; *N.T.*, *supra*, 34 Cal.App.5th at pp. 601-602.) The ultimate question is " ' "whether the trial court exceeded the bounds of reason. When two or more inferences can reasonably be deduced from the facts, the reviewing court has no

12

authority to substitute its decision for that of the trial court." ' " (*In re Marriage of G.* (2017) 11 Cal.App.5th 773, 780.)

B.     *Preclusive Effect of P.H.'s Guilty Plea*

S.H. contends that when the court in the criminal case against P.H. issued a three-year protective order in favor of her as a condition of probation, the court made a finding he had committed domestic violence against her, and that finding could not be collaterally attacked in the DVRO proceeding. By refusing to give preclusive effect to the prior finding, S.H. argues, the court in the DVRO proceeding erroneously refused to apply the mandatory presumption of Family Code section 3044[1] that P.H. should not have joint custody of their son and erroneously attributed to her the improper motive of seeking the DVRO so that she would have the advantage of the presumption in the custody dispute. We reject the premise of this claim of error.

In a case S.H. ignores, our Supreme Court more than 60 years ago explained that a guilty plea does not bar litigation of factual issues in a later related civil action.

> "A plea of guilty is admissible in a subsequent civil action on the independent ground that it is an admission. It would not serve the policy underlying collateral estoppel, however, to make such a plea conclusive. 'The rule is based upon the sound public policy of limiting litigation by preventing a party who has had one fair

---

[1]     "Upon a finding by the court that a party seeking custody of a child has perpetrated domestic violence within the previous five years against the other party seeking custody of the child, or against the child or the child's siblings, . . . there is a rebuttable presumption that an award of sole or joint physical or legal custody of a child to a person who has perpetrated domestic violence is detrimental to the best interest of the child, pursuant to Sections 3011 and 3020." (Fam. Code, § 3044, subd. (a).) "[A] finding of domestic abuse sufficient to support a [DVRO] necessarily triggers the presumption in section 3044." (*S.M. v. E.P.* (2010) 184 Cal.App.4th 1249, 1267.)

13

trial on an issue from again drawing it into controversy.' [Citation.] 'This policy must be considered together with the policy that a party shall not be deprived of a fair adversary proceeding in which fully to present his case.' [Citation.] When a plea of guilty has been entered in the prior action, no issues have been 'drawn into controversy' by a 'full presentation' of the case. It may reflect only a compromise or a belief that paying a fine [or accepting probation] is more advantageous than litigation. Considerations of fairness to civil litigants and regard for the expeditious administration of criminal justice [citation] combine to prohibit the application of collateral estoppel against a party who, having pleaded guilty to a criminal charge, seeks for the first time to litigate his cause in a civil action." (*Teitelbaum Furs, Inc. v. Dominion Ins. Co.* (1962) 58 Cal.2d 601, 605-606 (*Teitelbaum*); see *Isidora M. v. Silvino M.* (2015) 239 Cal.App.4th 11, 23, fn. 13 [*Teitelbaum* rule applied in DVRO case].)

"The admission is not conclusive, per se, and has no collateral estoppel effect. A plea may reflect a compromise or a choice not to undergo prosecution; it does not necessarily establish the underlying factual matters at issue in the civil litigation." (*Interinsurance Exchange v. Flores* (1996) 45 Cal.App.4th 661, 672.) The guilty plea " 'is merely evidence against the party and the party may contest the truth of the matters admitted by his plea and explain why he entered the plea.' " (*Oiye v. Fox* (2012) 211 Cal.App.4th 1036, 1052.) The trial court therefore did not err in considering the facts P.H. admitted as the basis for his guilty plea as admissions and allowing him to contest those facts in opposing S.H.'s request for a DVRO.

None of the cases S.H. cites in her brief supports application of collateral estoppel to P.H.'s guilty plea to prevent litigation of the factual basis of the plea and to trigger the Family Code section 3044 presumption. In all of the cited cases, the presumption applied because a court had made a prior finding of domestic violence *after a contested hearing*. (See *City and County of San Francisco v. H.H.* (2022) 76 Cal.App.5th 531, 540 [family court

14

issued three-year DVRO after contested hearing]; *Abdelqader v. Abraham* (2022) 76 Cal.App.5th 186, 194 [family court found domestic violence after contested hearing]; *Noble v. Superior Court* (2021) 71 Cal.App.5th 567, 573 [Utah court issued protective order after contested hearing]; *In re Marriage of Brewster & Clevenger* (2020) 45 Cal.App.5th 481, 487-489 [criminal court issued protective order when restrained party was found guilty after trial of stalking, vandalism, and unauthorized entry into residence]; *Jaime G. v. H.L.* (2018) 25 Cal.App.5th 794, 801 [family court issued two-year DVRO after contested hearing]; *Ellis v. Lyons* (2016) 2 Cal.App.5th 404, 409-410 (*Ellis*) [Massachusetts court issued protective order after contested hearing].) In P.H.'s criminal case, there was no hearing at which the relevant facts were contested and after which a finding of domestic violence was made. P.H. pled guilty to a violation of Penal Code section 647, subdivision (j)(4)(A), was granted probation, and a criminal protective order issued in favor of S.H. as a matter of course. (See *id.*, § 1203.097, subd. (a)(2) [terms of probation must include criminal protective order if victim is person defined in Fam. Code, § 6211, which includes spouse]; *People v. Cates* (2009) 170 Cal.App.4th 545, 550 [Pen. Code, § 1203.097 "encompasses defendants convicted of any crime of 'abuse' so long as the victim is a person identified in Family Code section 6211"].) The plea thus neither entitled S.H. to the Family Code section 3044 presumption nor precluded the trial court from considering whether she was seeking the DVRO to obtain the presumption.

C.     *Consideration of Improper Criteria*

S.H. next claims the trial court used improper criteria to deny her DVRO request. She contends the court erred by considering: (1) "assumption of [the] risk princip[le]s" based on her knowledge that P.H. was "a 'bad boy' " who had " 'a checkered past' "; (2) stereotypes about "tough" women;

15

(3) evidence from the custody hearing and certain testimony from the DVRO hearing to conclude she had exaggerated claims she feared for the safety of herself and her son; and (4) her motive for seeking the DVRO. We disagree. Although " 'a discretionary order based on an application of improper criteria . . . is not an exercise of informed discretion and is subject to reversal' " (*Eneaji v. Ubboe* (2014) 229 Cal.App.4th 1457, 1463), the trial court relied on no improper criteria.

The trial court did not improperly rely on assumption of the risk or stereotypes about women in its decision to deny S.H.'s DVRO request. The court nowhere stated S.H. had assumed the risk of domestic violence by marrying P.H. (see *Fonseca v. County of Orange* (1972) 28 Cal.App.3d 361, 369 ["assumption of risk typically embraces the voluntary or deliberate incurring of known peril"]), and it did not rely on any "outdated stereotypes" that "have no place in our law" (*In re Marriage of Carney* (1979) 24 Cal.3d 725, 728). Rather, based on the evidence presented at the hearing, the court concluded S.H. knew when she married P.H. that he was the type of person who used foul language and engaged in physical violence, that she herself did the same, and that "she liked the fact that he was a tough guy." Such considerations were relevant to S.H.'s claim she needed a DVRO because P.H. had "disturb[ed] her peace over an extended period of time." (See Fam. Code, § 6320, subd. (a) [court may enjoin party from "disturbing the peace of the other party"].) As used in the DVPA, " 'disturbing the peace of the other party' refers to conduct that, based on the totality of the circumstances, destroys the mental or emotional calm of the other party." (*Id.*, § 6320, subd. (c); see *In re Marriage of Nadkarni* (2009) 173 Cal.App.4th 1483, 1497.) "What disturbs the peace of a person differs in each case" (*K.L. v. R.H.* (2021) 70 Cal.App.5th 965, 981), and it is "essential . . . that the court rigorously

16

evaluate the evidence to ensure that the moving party has, in fact, been victimized" (*Conness v. Satram* (2004) 122 Cal.App.4th 197, 205 (*Conness*)). The trial court thus appropriately considered the personalities of S.H. and P.H. and the nature of their relationship in deciding whether his foul language and acts of violence caused "destruction of [her] mental and emotional calm, sufficient to support the issuance of a [DVRO]." (*Curcio v. Pels* (2020) 47 Cal.App.5th 1, 13 (*Curcio*).)

The trial court did not err by considering certain evidence to conclude S.H. had exaggerated her safety concerns. The court consolidated the DVRO and marital dissolution proceedings and held multiple hearings on the DVRO request and on child custody in the consolidated proceedings. (See pt. I.C., *ante*.) The court therefore could consider in the DVRO hearings evidence that was presented in the child custody hearings to the extent the evidence was relevant to the DVRO request. (Code Civ. Proc., § 1048, subd. (a); *Stubblefield Construction Co. v. City of San Bernardino* (1995) 32 Cal.App.4th 687, 701.) Evidence of S.H.'s credibility was relevant to the request and thus admissible in the DVRO hearing. (Evid. Code, §§ 210, 351; *Elkins v. Superior Court* (2007) 41 Cal.4th 1337, 1357-1358.) Nor did the court err by considering the testimony presented in the DVRO hearing about P.H. asking his son where he was during a video visit. S.H. testified she became concerned for her safety when P.H. asked their son, who was two-and-a-half years old at the time, where he was during the visit. When questioned about this incident, P.H. testified he asked his son where he had gone when he disappeared from the screen during the visit. Although, as S.H. points out, there was no testimony about whether the son could have provided an address to P.H., the trial court reasonably could infer from the child's age and from P.H.'s testimony that P.H. was not trying to ascertain

S.H.'s location and that the child could not provide that information. Such inferences support the court's further inference that S.H. was exaggerating when she testified the incident made her "concerned for [her] safety."

The trial court also did not err by considering S.H.'s motive for requesting the DVRO. We previously rejected her argument that P.H.'s guilty plea triggered the presumption of Family Code section 3044 and barred the court from considering whether she had requested the DVRO to obtain the presumption. (See pt. II.B., *ante*.) In deciding whether to grant S.H.'s request, the trial court was obligated to consider the totality of the circumstances. (Fam. Code, § 6301, subd. (c); *In re Marriage of F.M. & M.M.* (2021) 65 Cal.App.5th 106, 117 (*F.M. & M.M.*).) Such circumstances include the collateral consequences of the DVRO on P.H., such as giving S.H. the advantage of the Family Code section 3044 presumption in the parties' then-pending custody dispute. (See *Curcio*, *supra*, 47 Cal.App.5th at p. 13, fn. 6 [noting potential adverse consequences for restrained party]; *Ritchie v. Konrad* (2004) 115 Cal.App.4th 1275, 1291 (*Ritchie*) [noting DVRO may limit restrained party's access to children].) The trial court also was required "rigorously [to] evaluate the evidence to ensure that [S.H.] has, in fact, been victimized" (*Conness*, *supra*, 122 Cal.App.4th at p. 205), and in doing so properly considered any "bias, interest, or other motive" bearing on her truthfulness (Evid. Code, § 780, subd. (f)). The court therefore appropriately took S.H.'s litigation motives into account.

D.    *Misinterpretation of the DVPA*

As her last claim of error, S.H. complains the trial court misinterpreted provisions of the DVPA in finding P.H. had committed no abuse against her that would support issuance of the three-year DVRO she requested. S.H. faults the trial court for ignoring as an instance of abuse the fistfight P.H.

18

had with a friend in front of her and her son. She argues he committed an act of abuse when he violated the temporary DVRO by sharing a sexually explicit image of her with a friend after he had been served with the temporary DVRO. S.H. also contends P.H. committed acts of abuse by battering, molesting, harassing, threatening, and emotionally abusing her during the marriage. Had the court found such acts of abuse, S.H. argues, it is reasonably probable the court would have issued a DVRO. We are not persuaded. Although S.H. characterizes her claims as challenging legal errors in the trial court's interpretation of the DVPA, she is really attacking the court's factual findings rejecting her various claims of domestic violence, findings that we explain below are amply supported by the record.

The DVPA defines "domestic violence" to include "abuse" perpetrated against a spouse or a child. (Fam. Code, § 6211, subds. (a), (e).) It defines "abuse" to include "[t]o intentionally or recklessly cause or attempt to cause bodily injury," "[t]o place a person in reasonable apprehension of imminent serious bodily injury to that person or to another," and "[t]o engage in any behavior that has been or could be enjoined pursuant to Section 6320." (*Id.*, § 6203, subd. (a).) Family Code section 6320, subdivision (a) authorizes an order enjoining a party from, among other behaviors, "molesting," "threatening," "battering," "harassing," and "disturbing the peace of the other party." The party seeking the DVRO must prove a past act or acts of abuse by a preponderance of the evidence. (*Id.*, § 6300, subd. (a); *Curcio*, *supra*, 47 Cal.App.5th at p. 11.) The record supports the trial court's conclusion that S.H. did not meet her burden of proof.

The trial court did not "ignore" the fistfight between P.H. and his friend that occurred in the presence of S.H. and their son and that caused her to leave with the child. Such an incident may qualify as domestic violence if it

19

causes a spouse or a child reasonably to fear imminent serious bodily injury. (Fam. Code, §§ 6203, subd. (a)(3), 6211, subds. (a), (e); *Ellis*, *supra*, 2 Cal.App.5th at p. 418.) Although the court did not specifically mention the fistfight in its decision, it was not required to mention every alleged incident of domestic violence. (See, e.g., *Peak-Las Positas Partners v. Bollag* (2009) 172 Cal.App.4th 101, 112 [trial court's statement of decision need not address every legal and factual issue raised by parties].) The court stated it "ha[d] considered th[e] totality of the circumstances" and did not find that S.H. "was in reasonable apprehension of imminent serious bodily injury to her or to [her son]." The court found S.H. "liked the fact that [P.H.] was a tough guy." The court did "not believe [she] is afraid of [him]" or "afraid for her son in any way with regard to being with [P.H.]." This credibility finding against S.H. is binding on us. (*Curcio*, *supra*, 47 Cal.App.5th at p. 12.)

The trial court properly found S.H. had not adequately proved P.H. violated the temporary DVRO. Such a violation may itself constitute an act of domestic violence (Fam. Code, §§ 6203, subd. (a)(4), 6211, subd. (a); *N.T.*, *supra*, 34 Cal.App.5th at p. 602), and sending a sexually explicit image of the protected party to a third party may constitute "disturbing the peace of the [protected] party" (Fam. Code, § 6320, subds. (a), (c)). S.H., however, did not definitively establish P.H. had been served with the temporary DVRO before he sent his friend the image of her. The proof of service states P.H. was personally served on June 27, 2019, at 4:50 p.m. The document containing the image introduced at trial states it was "created" and "modified" on June 27, 2019, at 6:48 p.m., but not that it was transmitted to P.H.'s friend at that time. When questioned by his counsel, P.H. testified, "At the time I sent the picture there was no more contact." And when further questioned by his own counsel, P.H. said he "just assumed . . . off the paperwork that that was

20

the date," and agreed the document containing the image did not indicate he sent it to anyone on that date. The trial court described the record on the issue as "very murky," and found S.H. "did not carry [her] burden of proof that [the] sending [of] this [image] was a violation of the temporary restraining order." Since substantial evidence supports the court's finding, we must uphold it even though the court could have made a contrary finding based on the evidence. (*M.S.*, *supra*, 76 Cal.App.5th at pp. 1143-1144; *Curcio*, *supra*, 47 Cal.App.5th at p. 12.)

The record supports the trial court's finding S.H. did not prove P.H. committed an act of domestic violence against her on June 20, 2019, when she claims he committed a battery on her. Domestic violence includes battery of a spouse. (Fam. Code, §§ 6203, subd. (a)(4), 6211, subd. (a), 6320, subd. (a).) The court found that on the date at issue, P.H. threw his son's jacket at S.H. and "push[ed] her as part of mutual contact between the two." The court further found S.H. had not proved that P.H. "intentionally or recklessly caused or attempted to cause bodily injury" or that she "was in reasonable apprehension of imminent serious bodily injury to her[self] or to [her son]." (See *id.*, § 6203, subd. (a)(1), (3).) P.H.'s testimony that he threw his son's jacket up in the air and it landed on S.H.'s head "kind of funny," and that he "shoved her off" after she kicked him, support the trial court's findings. His testimony also supports conclusions that throwing the jacket neither was harmful to S.H. nor would have been offensive to a reasonable person and that he acted in self-defense when he shoved her. (See *So v. Shin* (2013) 212 Cal.App.4th 652, 669 [battery requires unconsented touching that harmed or offended plaintiff and would be offensive to reasonable person]; *In re Marriage of G.*, *supra*, 11 Cal.App.5th at pp. 779-781 [spouse does not commit domestic violence by using reasonable force to protect himself from

21

injury by other spouse].)  We thus reject S.H.'s contention that "[a]s a matter of law [P.H.] committed battery, an act of abuse against [her]."

S.H. complains the trial court failed to perceive as domestic violence the many occasions on which P.H. "molested," "harassed," "threatened," and "emotionally abused" her throughout their marriage by repeatedly using foul language with her, saying he would punch her in the mouth, telling her he would track her down and harm or kill her if she left him, instigating a violent brawl in front of her and her son, and engaging in "revenge porn" to humiliate her.  Domestic violence includes molestation, harassment, threats, and other conduct that causes a spouse reasonably to fear imminent serious bodily injury or that destroys the spouse's emotional calm.  (Fam. Code, §§ 6203, subd. (a), 6211, subd. (a), 6320, subds. (a), (c); *Rodriguez v. Menjivar* (2015) 243 Cal.App.4th 816, 820.)  S.H. presented evidence of the conduct of which she complains, including her own testimony, text messages, and other documents.  (See pts. I.D.1., 4., *ante*.)  But P.H. presented conflicting evidence, including his own testimony, cross-examination of S.H., and documents, that S.H. directed foul language at him, that he had never threatened to harm or kill her, that he had never been violent with a woman, that she tried to get back together with him whenever he threw her out, and that she knew he had exchanged sexually explicit images of her with others and did not care because she "was an exhibitionist at times."  (See pts. I.D.1.- 4., *ante*.)  It was up to the trial court to evaluate the parties' credibility and to resolve conflicts in the evidence, and it did so in favor of P.H.  The court expressly found S.H. "liked the fact that [P.H.] was a tough guy" and was herself "pretty tough too"; that she had "exaggerat[ed]" multiple incidents she claimed were domestic violence; and that she did not fear he would harm her or her son.  "We do not determine credibility or reweigh the evidence" (*Curcio*,

22

*supra*, 47 Cal.App.5th at p. 12), and "[w]e accept as true all evidence tending to establish the correctness of the trial court's findings, resolving every conflict in the evidence in favor of the judgment" (*In re Marriage of Fregoso & Hernandez* (2016) 5 Cal.App.5th 698, 702). We must decline S.H.'s implicit invitation to evaluate the evidence independently and to draw a conclusion different from that of the trial court.

Even if the trial court had found P.H. committed an act of domestic violence, it would not necessarily have abused its discretion by denying S.H.'s DVRO request. The DVPA provides that a court "may" issue a DVRO when the statutory criteria are met. (Fam. Code, §§ 6320, subd. (a), 6345, subd. (a).) In determining whether the court erred, "we consider whether [its] exercise of discretion is consistent with the statute's intended purpose." (*People v. Rodriguez* (2016) 1 Cal.5th 676, 685; accord, *F.M. & M.M.*, *supra*, 65 Cal.App.5th at p. 116.) "The purpose of [the DVPA] is to prevent acts of domestic violence, abuse, and sexual abuse and to provide for a separation of the persons involved in the domestic violence for a period sufficient to enable these persons to seek a resolution of the causes of the violence." (Fam. Code, § 6220.) "The purpose of a [DVRO] is not to punish past conduct, but to 'prevent acts of domestic violence [and] abuse' from occurring in the future." (*F.M. & M.M.*, at p. 117.) The DVPA is forward-looking, and the evidence presented at the DVRO hearing supports a finding S.H. was not at risk of future domestic violence. By the time of the trial court's decision, the parties had lived apart for more than two years. At the DVRO hearing, S.H.'s counsel conceded that S.H.'s only contact with P.H. since June 20, 2019, had been on an electronic coparenting platform and in court. P.H. testified that since that date, he had not tried to learn S.H.'s location and "want[ed] nothing to do with [her]." The court found no violations of the temporary

23

DVRO, which had been in effect for more than two years, and found S.H. was not afraid of P.H. The court therefore did not " ' "exceed[ ] the bounds of reason" ' " by denying S.H.'s request for a three-year DVRO. (*In re Marriage of G., supra,* 11 Cal.App.5th at p. 780; cf. *Ritchie, supra,* 115 Cal.App.4th at p. 1290 [trial court should renew DVRO "if, and only if, it finds by a preponderance of the evidence that the protected party entertains a 'reasonable apprehension' of future abuse"].)

In conclusion, our review of the record has satisfied us that the trial court took seriously S.H.'s allegations of domestic violence, gave the parties a full and fair hearing, carefully considered and weighed the conflicting evidence they introduced and their credibility, and correctly interpreted and applied the DVPA to conclude that the three-year DVRO that S.H. had requested should not issue. We have found no legal error and have determined substantial evidence supports the trial court's factual findings. The court therefore did not abuse its discretion in denying S.H.'s DVRO request.

24

### III.

### DISPOSITION

The order denying S.H.'s request for a three-year DVRO is affirmed.


IRION, J.

WE CONCUR:


McCONNELL, P. J.


BUCHANAN, J.